On Application for Rehearing
The opinion of December 8, 1995, is withdrawn, and the following opinion is substituted therefor.
Larry Eugene Hutcherson was convicted of murder made capital because it was committed during the course of robbery and sodomy. See § 13A-5-40(a)(3) and -(a)(4), Ala. Code 1975. The jury voted 11 to 1 to recommend the death penalty. The trial court accepted the jury's recommendation and sentenced Hutcherson to death. The Court of Criminal Appeals affirmed the conviction and the sentence. Hutcherson v. State,677 So.2d 1174 (Ala.Crim.App. 1994). This Court has granted certiorari review.
The state's evidence tended to show the following: On June 27, 1992, the body of 89-year-old Irma Thelma Gray was discovered in her home on Moffat Road in Mobile County. Her throat had been cut so severely that she had almost been decapitated. The medical examiner also found other injuries, including cuts, bruises, and multiple fractures to the ribs. The medical examiner also found evidence of sodomy.
There were signs of a forced entry into the house, and the house was in total disarray. Several items were missing, including a window unit air conditioner, a microwave oven, a television, and a radio. Hutcherson's driver's license was found in front of the closets in one of the bedrooms. A bloody knife was also found near the license.
A fingerprint on Ms. Gray's washing machine matched the print of Hutcherson's right thumb. A rag found in the garage was covered in blood that was consistent with Hutcherson's blood type. Also, blood found on the windowsill was consistent with Hutcherson's blood type. Blood found on Hutcherson's blue jeans was consistent with Gray's blood type.
Hutcherson was picked up by Mobile police on an arrest warrant from the City of Prichard, based on a traffic offense. After being taken to the police station and being read hisMiranda rights, Hutcherson asked to speak to a detective; while speaking with the detective, he confessed to the murder.
Three witnesses testified that Hutcherson had sold them a television, a radio, and a microwave oven, respectively, all of which had belonged to Gray. Hardy Avera, a friend of Hutcherson's, testified that on the night of June 25, 1992, Hutcherson said he thought he had killed someone. On June 26, 1992, Hutcherson and Avera went to Gray's house; Hutcherson went inside and came back with an air conditioner. There was testimony that Hutcherson's stepfather, Jackie Lang, also went to Gray's house with Hutcherson to get some items, which he kept.
Hutcherson raised 32 issues in his brief in this Court. However, we need only address the issue regarding the admission of DNA (deoxyribonucleic acid) evidence; our resolution of that issue requires a reversal.
Basically, DNA is found in the nucleus of most cells of the body and is unique to the individual, except in the case of identical twins. It is composed of a long double helix, which resembles a spiral staircase. The backbone of the DNA molecule consists of repeated sequences of phosphate and deoxyribose sugar. Attached to the sugar links in *Page 1207 
the backbone are four types of organic bases: adenine, guanine, cytosine, and thymine. The steps of the staircase are formed by pairs of these bases. A single DNA molecule consists of approximately three billion base pairs. The sequence of these pairs is what distinguishes one person's DNA from another.
In Ex parte Perry, 586 So.2d 242 (Ala. 1991), this Court set out the following three-pronged test, which must be met in order to admit DNA evidence: (1) "Is there a theory, generally accepted in the scientific community, that supports the conclusion that DNA forensic testing can produce reliable results?" (2) "Are there current techniques that are capable of producing reliable results in DNA identification and that are generally accepted in the scientific community?" and (3) "In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the performance or interpretation of the tests?" 586 So.2d at 250.
Before the court can admit challenged DNA evidence, it must hold a hearing, outside the presence of the jury, to determine if the Perry test has been met. 586 So.2d at 254-55.
Hutcherson argues that the State failed to comply withPerry, in that the trial court did not conduct a hearing outside the presence of the jury, and furthermore, he argues, the testimony failed to satisfy the complete Perry test.
The State contends that although the Perry test was not satisfied, because there was no hearing outside the presence of the jury, the admission of DNA evidence was harmless error because, it says, there was no doubt that the victim had been sodomized and murdered by Hutcherson. The State argues that in this case the factfinder could have drawn no inference from the presence of the semen in the victim's rectum except that Hutcherson had committed the sodomy and could have drawn no inference from the blood samples taken at the crime scene, which matched the blood types of Hutcherson and the victim, except that he had committed the murder. The State argues that other states have applied the harmless error doctrine to the admission of DNA evidence when there is other overwhelming evidence of guilt.
In affirming, the Court of Criminal Appeals held that because of the other evidence of guilt, the admission of the DNA evidence, though erroneous because the State had failed to comply with Perry, was harmless.
At the outset, we note that this Court's reasoning inPerry for establishing standards to be met before the court admits DNA evidence is that DNA evidence is relatively new and the resulting prejudice to the defendant is sufficiently great. Therefore, a foundation must be laid as to the overall admissibility of the evidence.
Generally, there are two types of DNA evidence that may be admissible. One is DNA "matching" evidence, where one sample of DNA matches another sample. The other is DNA population frequency statistics, where the testimony concerns the frequency with which a given DNA pattern might occur statistically or might occur in a given population. There are scientific reasons for distinguishing between the two. The evidence necessary to show a "match" does not alone indicate the frequency with which that DNA pattern might occur. Population frequency statistics, on the other hand, require data on the relevant populations involved as well as data for mathematical, statistical analysis.
There are also legal reasons for distinguishing between DNA "matching" evidence and DNA population frequency statistics. DNA "matching" evidence might indicate that everyone's DNA is unique, but the impact of that testimony might not be as strong as saying that one person in hundreds of millions of people might have DNA similar to the DNA found at the crime scene. One could argue that the prejudicial impact of the statistics might unduly impact on the jury. However, a blanket statement that the DNA found at the crime scene "matched" the defendant's DNA might be just as prejudicial as statistical evidence if the term "match" is not defined. It could be that the jury would interpret such a statement to mean the DNA was anexact "match" with that of the defendant's and not a statistical probability, regardless of how high the statistic. *Page 1208 
The testimony concerning DNA evidence in this case was as follows: The State presented the testimony of Sarah Elaine Scott. Scott is a forensic scientist. (R.T. 319.) She testified that she identifies and characterizes bodily fluids. (R.T. 319-22.) Scott has a master's degree and has had special training in serological research by the FBI, the American Academy of Forensic Scientists, and several private corporations that do serological work. (R.T. 319-22.) She testified that she collected fluid stains from the victim and her home. (R.T. 322.)
Scott stated that she tested blood taken from the victim at the autopsy, along with blood stains found at the crime scene. (R.T. 322-25.) She testified that the blood and bloodstains were first tested by a conventional method called a "PGM test," which identifies the amount of red cell enzymes in the blood. (R.T. 327.) She stated that the victim was a "2AIA" type and that Hutcherson was a "1A" type. (R.T. 327.)
Scott stated that "1A" type blood was found on a rag inside a car. (R.T. 330-31.) She said that blood found on the victim's porch was type "1A" and that blood found on Hutcherson's jeans was type "2AIA." (R.T. 330-31.)
Scott testified that blood on a knife found in Hutcherson's possession was not sufficient to type with the conventual PGM test, so that a DNA test had to be done. (R.T. 331.) Also, she said, swabs taken from the victim's rectum had to be tested for DNA. Scott testified that DNA matching and testing were generally accepted in the scientific community. (R.T. 332.) Next, Scott explained that DNA is a person's genetic makeup and that it is unique to each individual. (R.T. 332.) Scott further testified that the techniques used in her lab were generally accepted in the scientific community. (R. 333.)
Hutcherson's counsel asked for voir dire examination of Scott on the DNA issue. (R.T. 335.) Counsel asked Scott how DNA is matched up. (R.T. 335-36.) Scott stated that it is a six-week process in which DNA is separated from the stain and "cut." (R.T. 336-40.) The DNA chain that results is then examined under a microscope. (R.T. 341.) Viewed under the microscope, "ladder lanes" with standard DNA genetic markers are compared with the DNA fluid stains from the crime scene. (R.T. 341-42.) She stated that the ladder lanes are developed in a laboratory by Lifecodes, a private corporation in the business of DNA testing. (R.T. 341-43.) The laboratory-created ladder lanes are compared with the DNA strands extracted from the stains. (R.T. 342-44.)
Hutcherson's counsel objected to Scott's testimony concerning DNA because there had been no testimony about Lifecodes' acceptance in the general community for being reliable and no testimony about Lifecodes' technique and the sample ladder lanes that are used to match the DNA. (R.T. 344.) The trial court overruled the objection. Subsequently, Scott testified that the DNA tests were consistent with the blood type tests that had been done. (R.T. 346.)
Immediately after Scott testified, Roger Morrison, a forensic scientist with the Alabama Department of Forensic Sciences, testified. (R.T. 347.) Morrison stated that he performed "DQ Alpha" tests on the various samples sent to him for analysis by Elaine Scott. (R.T. 350.) He testified that a DQ Alpha test examines and identifies a gene in the human leukocyte antigen system. (R.T. 350.)
Morrison testified that the victim was DQ Alpha type 1.2, 2 and that Hutcherson was a 1.1, 1.2. He stated that the sample taken from the spermatozoa found in the victim's rectum was DQ Alpha type 1.1, 1.2 — consistent with Hutcherson's type.
Morrison then described the DQ Alpha testing process. He stated that the DNA is extracted from a stain. (R.T. 354-55.) Then, the DQ Alpha gene is identified from the DNA strand. (R.T. 354-55.) Morrison testified that DQ Alpha testing is generally accepted by the scientific community and that the techniques used by his lab were generally accepted in the scientific community. (R.T. 356.) Morrison then went on to explain the technique he used and one type of quality control used by his lab to prevent error. (R.T. 356-58.)
After reviewing the DNA testimony given in this case, we agree with the Court of *Page 1209 
Criminal Appeals that the trial court erred in failing to conduct a hearing outside the presence of the jury on the admissibility of the DNA evidence. We also agree that the State failed to comply with Perry, because there was insufficient testimony concerning the reliability of the test results. Specifically, the testimony from forensic scientist Elaine Scott failed to satisfy the third prong of the Perry test because she did not testify as to the quality controls used by the Mobile laboratory. Additionally, testimony from Roger Morrison failed to sufficiently meet the third prong, because he explained only one type of quality control procedure used and did not testify as to other quality control procedures used except to state generally that quality controls were used. However, we disagree with the Court of Criminal Appeals' application of the harmless error doctrine to the admission of DNA evidence.
"Harmless error" is defined as "an error which is trivial or formal or merely academic and was not prejudicial to the substantial rights of the party assigning it and in no way affected the final outcome of the case." Black's Law Dictionary
718 (6th ed. 1990). In order to secure a reversal of a judgment, an appellant not only must show error, but also must demonstrate that the error resulted in a substantial injury. Rule 45, A.R.App.P. Overwhelming evidence of guilt does not render prejudicial error harmless under Rule 45. Ex parte Lowe,514 So.2d 1049 (Ala. 1987).
In a case somewhat similar to this one, Malone v. City ofSilverhill, 575 So.2d 101 (Ala.Cr.App. 1989), involving a prosecution for driving under the influence of alcohol, the Court of Criminal Appeals held that the erroneous admission of the results of an "HGN" test without a proper predicate was harmless error because there was other overwhelming evidence of guilt. We reversed, holding that the erroneous admission of the results of an "HGN" test without a proper predicate required reversal, regardless of the other evidence of guilt. Ex parteMalone, 575 So.2d 106 (Ala. 1990). Specifically, we stated that the problem with the improper admission of the evidence was attributable to the scientific nature of the test and the disproportionate impact it might have had on the jury's decision-making process." 575 So.2d at 107.
" 'Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' " Ex parte Greathouse,624 So.2d 208 (Ala. 1993), quoting Chapman v. California,386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1982).
We hold that the admission of the DNA evidence wasnot harmless beyond reasonable doubt. The prejudicial impact of both DNA "matching" evidence and DNA population frequency statistics creates such a possibility for prejudicial impact upon the jury that the admission of DNA evidence without complying with Perry can never be harmless error. Perry sets out the predicate for properly admitting DNA evidence, and it must be followed in order to ensure the reliability and trustworthiness of the evidence. The prejudicial impact of scientific testimony, such as that relating to DNA, can unduly influence a jury; it must have a proper foundation before it is presented. A specific example of how DNA evidence probably influenced the jury in this case is Roger Morrison's testimony. The only evidence linking Hutcherson to the sodomy charge was Morrison's testimony that semen found in the victim's rectum "matched" Hutcherson's. However, at least two other males had visited the crime scene, and their bodily fluids were never tested. This alone could create a reasonable doubt as to Hutcherson's guilt on the sodomy charge. Certainly, the DNA evidence from Morrison regarding the semen contributed to Hutcherson's conviction.
Based on the State's failure to comply with the standard we set out in Perry regarding DNA evidence, we must reverse the judgment of the Court of Criminal Appeals and remand the cause for further proceedings consistent with this opinion.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; REVERSED AND REMANDED. *Page 1210 
HOOPER, C.J.,* and ALMON,* SHORES, and COOK, JJ., concur.
MADDOX and BUTTS, JJ., dissent.
* Although Chief Justice Hooper was not a member of this Court when this case was orally argued, he has listened to the tape of the oral argument. Justice Almon did not sit for oral argument, but he has listened to the tape of the oral argument.