[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1095 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1096 
Kenneth Loggins was charged with two counts of capital murder. Count I of the indictment charged Loggins with the murder of Vicki Deblieux, a murder made capital because it occurred during a kidnapping in the first degree or an attempt thereof, Ala. Code 1975, § 13A-5-40(a)(1). Count II charged Loggins with the murder of Vicki Deblieux, made capital because it was committed during a robbery in the first degree or an attempt thereof, Ala. Code 1975, § 13A-5-40(a)(2). As to Count I, the jury found Loggins guilty of the capital murder charged; as to Count II, it found him guilty of intentional murder, a lesser-included offense as to the capital murder charged. The trial court entered a judgment of conviction on each verdict.
With regard to Loggins's conviction for capital murder, the jury recommended the death penalty, by a vote of 10 to 2. The trial court accepted the jury's recommendation and sentenced Loggins to death by electrocution. The trial court sentenced Loggins to life in prison for his conviction of intentional murder.
On April 30, 1999, the Court of Criminal Appeals affirmed Loggins's conviction for capital murder and his sentence of death. Loggins v.State, 771 So.2d 1070 (Ala.Crim.App. 1999). The Court of Criminal Appeals also vacated Loggins's conviction for intentional murder, as a lesser offense included in the capital murder charged in Count II, on double-jeopardy grounds. Thereafter, the Court of Criminal Appeals denied Loggins's application for rehearing, without opinion.
This Court granted Loggins's petition for certiorari review, to review the opinion of the Court of Criminal Appeals and to search the record for plain error, pursuant to Rule 39(k), Ala.R.App.P. Loggins raised 10 issues in his petition; each of them was adequately addressed and properly decided by the Court of Criminal Appeals. However, we will address three of those issues — whether the prosecutor impermissibly commented on Loggins's failure to testify at trial; whether the trial court erred in admitting into evidence approximately 50 autopsy photographs of the victim; and whether, in light of the trial court's findings as to aggravating and mitigating circumstances, that court erred in sentencing Loggins to death. For the reasons we will discuss in detail in Parts I through III of this opinion, we affirm the judgment of the Court of Criminal Appeals.
The facts relating to this case are set out in considerable detail in the opinion of the Court of Criminal Appeals, 771 So.2d 1070. We will not restate them in detail here. However, we will outline the facts essential to a consideration of the three issues we address. Most of the facts relevant to these issues are set out in the trial court's sentencing order, which reads, in pertinent part:
 "On the night of [February 21, 1994,] Vicki Deblieux, age 37, was dropped off by a friend on [Highway] I-59 near Chattanooga, Tennessee, to hitchhike to her mother's home in Louisiana.
 "Four teenagers — the defendant [Loggins], Carey Dale Grayson, Trace Duncan and Louis Mangione — all [of whom] had been drinking alcohol and using drugs, saw her hitchhiking on I-59 at the Trussville exit in Jefferson County, Alabama. They offered to take her to Louisiana; instead they took her to a wooded area, on the pretense of picking up another vehicle.
 "After arriving in this area, they all got out of the vehicle, and began to drink. [Loggins, along with the others, threw bottles at Ms. Deblieux, who began to run from them.] They tackled her to the ground and began to kick her *Page 1097 
repeatedly all over her body. When they noticed that she was still alive, the defendant stood on her throat, until she gurgled blood and said `Okay, I'll party,' then died.
 "They then put her body in the back of a pickup truck and took her and her luggage to Bald Rock Mountain, after removing her clothing [and a ring,] and they played with her body and then threw her off a cliff.
 "They then went to a car wash in Pell City to wash the blood out of the truck. [After rummaging through her luggage, they hid the luggage in the woods.]
 "On their return to Birmingham they took Mangione home and then returned to Bald Rock Mountain, where they began to mutilate the body by stabbing and cutting her 180 times, removing part of a lung and removing her fingers and thumbs.
 "The next morning, the defendant's girlfriend found the three of them in Birmingham asleep in the truck all covered in mud and blood. The defendant told her they got blood on them from a dog.
 "On [February 26, 1994,] three rock climbers found the victim's body and called the police. Her body was taken to the medical examiner's office.
 "The medical examiner found the following injuries: almost every bone in her skull was fractured, every bone in her face was fractured at least once, lacerations on the face over these fractures, a missing tooth, left eye was collapsed, right eye was hemorrhaged, tongue discolored, 180 stab wounds (postmortem), two large incisions in her chest, her left lung had been removed and all her fingers and both thumbs were cut off.
 "The medical examiner opined that the cause of death was blunt force trauma to the head and possible asphyxiation.
 "All defendants were later arrested after Mangione began showing one of the victim's fingers to friends."
(Supplemental Record, C. 12-13.) See Loggins v. State, 771 So.2d at 1074-75.
Several of Loggins's friends and acquaintances testified during the State's case-in-chief that Loggins had bragged and even joked with them about killing a hitchhiker. Sonja Gray met Loggins while she was working at a Hardee's restauarant, and Gray was a friend of Amy White, who was Loggins's girlfriend. Gray also knew Duncan, Grayson, and Mangione, Loggins's codefendants. Gray testified about a morning in late February 1994, when she and Amy White went looking for Loggins. Gray testified that, as she and White were driving past the Hardee's restaurant at Chalkville, where she and Dale Grayson worked, they noticed Loggins's white pickup truck in the parking lot. The two girls stopped and looked inside the truck and saw Loggins, Grayson, and Duncan asleep. Gray testified that the three men were covered with mud and blood. When Gray asked the men about their appearance, one of them told her that they had killed a dog that was chasing the truck.
The subject of how the men came to be covered in mud and blood came up again in late March 1994, in Duncan's apartment. Gray and another girl, Danielle Boso, were listening to music with Duncan, Loggins, and Mangione, when Gray asked whether they had killed a dog or a hitchhiker. Mangione told her they had killed a hitchhiker. Mangione asked Gray who told her about the hitchhiker: Boso said that Amy White had told them. Loggins then told the girls that "Amy was dead, and if [they] breathed a word of it, [they] would be next." Loggins told the girls that they had picked up a hitchhiker, and that he had put his foot on her throat and said "hurry up and die."[1] Loggins told the girls that the hitchhiker "choked up blood" *Page 1098 
and that the men cut off the victim's fingers to prevent her from being identified. Then the men took her body to Bald Mountain and threw the body over a cliff.
Danielle Boso's testimony was essentially the same as the testimony given by Gray. Boso testified that she was with Gray in Duncan's apartment. She testified that Loggins was the person who related the story about the hitchhiker. Boso testified that Loggins said he and the others picked the victim up on the Trussville exit on I-59 and that they took her to Loggins's truck and then took her into the woods, where they killed her, and then threw her body over a cliff. Boso testified that Loggins said the men returned to Bald Mountain that night and that they "cut off her fingers, took out her teeth, took out her brain, her eye, and took out her heart and took a bite if it." (R. 473.) (The results of this mutilation are depicted in many of the crime-scene and autopsy photographs that Loggins would have preferred the jury not see.) Boso testified that one of the men said that they performed the postmortem mutilations to hinder identification of the victim.
Hope Hanson knew Loggins and the other codefendants because, she said, they "hung around" with Duncan, who was her brother's friend. Hanson testified that in late February 1994, she overheard Loggins and Grayson talking about "fingers behind Bruno's" (an apparent reference to a supermarket). Hanson testified that either Grayson or Loggins was talking about "fingers being thrown" and that one of the men joked about throwing someone's fingers in the front yard of her apartment complex. Finally, Hanson testified that she occasionally heard Loggins and the other men joke about picking up a hitchhiker.
Before trial, Loggins entered a plea of not guilty by reason of mental disease or defect. Dr. Samuel E. Fleming III, Ph.D., a clinical psychologist, testified for the defense during the guilt phase of the trial. He testified that he gave Loggins two Minnesota Multiphasic Personality Inventory ("MMPI") tests during his evaluation. Fleming testified that Loggins scored high on the scale used to indicate the presence of schizophrenia and antisocial behavior. Fleming did not "think there was any question" that when he killed Ms. Deblieux Loggins was suffering from a severe mental illness that caused him to be unable to appreciate the wrongfulness of his acts. Fleming testified that "there was a possibility" that Loggins was insane at that time and that there was "no question" that Loggins suffered from a diminished capacity.
The State offered the testimony of Dr. C.J. Rosecrans, a clinical psychologist, in rebuttal to the testimony of Dr. Fleming.
Dr. Rosecrans testified that he interviewed Loggins on two occasions and that he gave Loggins an MMPI test, as well as a Rorschach inkblot test. Dr. Rosecrans testified that he also obtained information about Loggins from other sources, including investigative reports and Dr. Fleming's report. In Dr. Rosecrans's opinion, Loggins was not suffering from a severe mental disease or defect when he killed Ms. Deblieux. Furthermore, in Dr. Rosecrans's opinion, at the time of the killing Loggins was able to distinguish right from wrong and to appreciate the wrongfulness of his conduct. Finally, Dr. Rosecrans testified that, while the effect of drugs and alcohol may have reduced Loggins's inhibitions, it would not have prevented him from distinguishing between right and wrong.
The defense also called several of Loggins's former school counselors and teachers to testify about Loggins's emotional problems in general. They described "rages" they said Loggins went into on a nearly daily basis and stated that when these rages occurred Loggins was not aware of what he was doing.
 I.
The prosecutor made the following comment during his rebuttal closing argument *Page 1099 
in the penalty phase of Loggins's trial: "And throughout every word you've heard from this witness stand in this courtroom this entire week has there been an iota of remorse? None. Absolutely none." Loggins argues that the prosecutor's comment constitutes a direct comment on his failure to testify at trial. Therefore, he argues that his conviction and sentence must be reversed and his case remanded for a new trial. For the reasons stated below, we disagree.
The relevant portions of the prosecutor's rebuttal closing argument during the penalty phase of Loggins's trial were as follows:
 "[T]he teachers said and told you he sometimes had uncontrollable outbursts where he didn't know what was going on. . . . This was not an uncontrollable outburst by any means. For reasons that you already know and have heard so many times, why did he cover it up? Why did he plan it? Why did he call [Vicki Deblieux] the perfect victim? And even if you give some credence to the theory that this emanated from some uncontrollable outburst that he might have demonstrated in a school setting, a temper tantrum if you will, . . . how do you account for the fact that all three of those teachers said when he had those uncontrollable outbursts and he didn't know what was going on, it was like he had no memory of it? He didn't brag about later on. But what did he do in this case? He was the leader of the pack in telling Sonja and Danielle about what had happened. And what did he say to them about Amy? Not to [his teacher], what did he say to [his friends] about Amy? Well, she's dead, too, for telling Why? Because he was going to get in trouble.
". . . .
 ". . . [H]e had a dual purpose not identifying her when he cut off her fingers [sic]. He was so proud of this. And what does this tell you about whether he enjoyed the degradation, the humiliation, the pain and suffering? He cut off her fingers to keep from being identified, and then was so proud of what he had done that he went to the one absent musketeer, and said, here, Lou [Mangione], here's a souvenir. It is beyond comprehension that there could be a case more especially heinous, atrocious and cruel than this.
 "And [Loggins] deserves to pay the ultimate penalty for the ultimate crime. And if there's one smidgen of thought in your mind that he might have ever felt anything but a thrill out of this, look back to where he wrote — whether they're his words or lyrics that he liked, `I am free. I can kill without remorse.' And throughout every word you've heard from this witness stand in this courtroom this entire week has there been an iota of remorse? None. Absolutely none. What you got instead was much later on about the last thing we know of that he said to other people before he got arrested [sic] when he and [a codefendant] laughingly said to each other that Hope Hanson overheard, `let's go pick a hitchhiker.' And can't we all thank God on behalf of whoever was out on that interstate the next night that he got arrested before he did."
(R. 1061-65.) (Emphasis added.)
Initially, we note that Loggins did not object to the prosecutor's comment he now complains of and, thus, did not preserve this issue for review. However, because the death penalty has been imposed in this case, we are obliged, pursuant to Rule 39(k), Ala.R.App.P., to search the record for "plain error." Plain error is error that "has or probably has adversely affected the substantial rights of the [defendant]." Rule 39(k), Ala.R.App.P.; see Ex parte Myers, 699 So.2d 1285, 1290 (Ala. 1988), cert. denied, 522 U.S. 1054 (1998). Error is plain if "`the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Haney v. State,603 So.2d 368, *Page 1100 
392 (Ala.Crim.App. 1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925 (1993) (citation omitted). "`However, the failure to object should be weighed as part of our evaluation of the comments, because the failure to object may suggest that the defense did not consider the comments to be particularly harmful. Ex parte Kennedy,472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340,88 L.Ed.2d 325 (1985).' Ex parte Payne, 683 So.2d 458, 465 (Ala. 1996)[, cert. denied, 520 U.S. 1146 (1997)]." Ex parte Clark, 728 So.2d 1126,1129 (Ala. 1998). See also Ex parte Land, 678 So.2d 224, 233 n. 2 (Ala.), cert. denied, 519 U.S. 933 (1996).
In Alabama, the right to be free from compulsory self-incrimination is protected both by the constitution and by statute. "[I]n all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself. . . ." Alabama Constitution 1901, Art. I, § 6. Exparte Brooks, 695 So.2d 184 (Ala.), cert. denied, 522 U.S. 893 (1997). Section 12-21-220, Ala. Code 1975, reads:
 "On the trial of all indictments, complaints or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness, and his failure to make such a request shall not create any presumption against him nor be the subject of comment by counsel. If the district attorney makes any comment concerning the defendant's failure to testify, a new trial must be granted on motion filed within 30 days from entry of the judgment."
Id. (Emphasis added.)
 "A comment on the defendant's failure to testify is to be `scrupulously avoided.' Arthur v. State, 575 So.2d 1165, 1186 (Ala.Crim.App. 1990), cert. denied, 575 So.2d 1191 (Ala. 1991). Where there has been a direct comment on, or direct reference to, a defendant's failure to testify and the trial court does not act promptly to cure the comment, the defendant's conviction must be reversed. Ex parte Wilson, 571 So.2d 1251 (Ala. 1990). Where the comment is an indirect, rather than a direct, comment on the defendant's failure to testify, the conviction must be reversed if there is a close identification of the defendant as the person who did not become a witness. Wilson, 571 So.2d at 1261."
Ex parte Purser, 607 So.2d 301, 304 (Ala. 1992).
In Clark, supra, this Court wrote:
 "`Comments by a prosecutor on a defendant's failure to testify are highly prejudicial and harmful, and courts must carefully guard against a violation of a defendant's constitutional right not to testify. Whitt [v. State, 370 So.2d 736 (Ala. 1979)], supra, at 739; Ex parte Williams, 461 So.2d 852, 853 (Ala. 1984); see Ex parte Purser, 607 So.2d 301 (Ala. 1992). This Court has held that comments by a prosecutor that a jury may possibly take as a reference to the defendant's failure to testify violate Art. I, § 6, of the Alabama Constitution of 1901. Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224
(1996); Ex parte McWilliams, 640 So.2d 1015 (Ala. 1993); Ex parte Wilson, [571 So.2d 1251, 1261 (Ala. 1990)]; Ex parte Tucker, 454 So.2d 552 (Ala. 1984); Beecher v. State, 294 Ala. 674, 320 So.2d 727 (1975). Additionally, the Fifth and Fourteenth Amendments of the United States Constitution may be violated if the prosecutor comments upon the accused's silence. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Ex parte Land, supra; Ex parte Wilson, supra. Under federal law, a comment is improper if it was "`"manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."'" United States v. Herring, 955 F.2d 703, 709 (11th Cir.), *Page 1101 
cert. denied, 506 U.S. 927, 113 S.Ct. 353, 121 L.Ed.2d 267 (1992) (citations omitted); Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984). The federal courts characterize comments as either direct or indirect, and, in either case, hold that an improper comment may not always mandate reversal.'"
728 So.2d at 1130 (quoting Brooks, supra, 695 So.2d at 188).
It is well settled that, in determining whether a prosecutor's comment is tantamount to an impermissible reference to the accused's failure to testify, the comment must be considered in the context in which it was made:
 "`"[O]nce a defendant chooses not to testify at his trial the exercise of that choice is not subject to comment by the prosecution." Wherry v. State, 402 So.2d 1130, 1133 (Ala.Cr.App. 1981). "In determining if a prosecutorial remark impairs the integrity of the defendant's right not to testify the test is whether the defense can show that the remark[, given the context in which it was made,] was intended to comment on the defendant's silence or was of such character that a jury would naturally and necessarily construe it as a comment on the defendant's silence." United States v. LeQuire, 943 F.2d 1554, 1565 (11th Cir. 1991), cert. denied, 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906
(1992).'
"Ex parte Davis, 718 So.2d 1166, 1173 (Ala. 1998)."
Maples v. State, 758 So.2d 1, at 21 (Ala.Crim.App.), aff'd, 758 So.2d 81
(Ala. 1999).
Not every comment that refers or alludes to a nontestifying defendant is an impermissible comment on his failure to testify; the prosecutor has a right to comment on reasonable inferences from the evidence:
 "`During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference. Rutledge v. State, 523 So.2d 1087 (Ala.Crim.App. 1987), rev'd on other grounds, 523 So.2d 1118 (Ala. 1988). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655
(1973). In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, no fixed standard can be applied, and each case must be judged on its own merits. Hooks v. State, 534 So.2d 329
(Ala.Crim.App. 1987), aff'd, 534 So.2d 371 (Ala. 1989).'
 "McMillian v. State, 594 So.2d 1253, 1262 (Ala.Crim.App. 1991), remanded on other grounds, 594 So.2d 1288 (Ala. 1992).
 "`"Counsel in making argument to the jury have a right to state their conception of what the evidence is." Hope v. State, 21 Ala. App. 491, 492, 109 So. 521, 522
(1926). "Certainly, the State has as much right as the defendant to argue to the jury every matter of legitimate inference from the evidence, and . . . `the evidence may be examined, collated, sifted, and treated in [the solicitor's] own way.'" White v. State, 41 Ala. App. 54, 58, 123 So.2d 179, 181-82, cert. denied, 271 Ala. 702, 123 So.2d 186 (1960). "Whether an inference is reasonable is generally within the sound discretion of the trial judge." Hayes v. State, 588 So.2d 502, 505-06 (Ala.Crim.App. 1991).'
 "DeBruce v. State, 651 So.2d 599 (Ala.Crim.App. 1993) [aff'd, 651 So.2d 624 (Ala. 1994)]."
Lloyd v. State, 629 So.2d 662, 663-64 (Ala.Crim.App. 1993) (alteration inLloyd). Moreover, remorse is also a proper subject *Page 1102 
of closing arguments. Dobyne v. State, 672 So.2d 1319, 1348-49
(Ala.Cr.App.), on return to remand, 672 So.2d 1353 (Ala.Cr.App. 1994), aff'd, 672 So.2d 1354 (Ala. 1995), cert. denied, 517 U.S. 1169 (1996).
During the guilt phase of Loggins's trial, defense counsel presented evidence indicating that Loggins went into fits, which his former teachers described as "rages," almost daily. Loggins's defense attorneys referred to these fits in their closing arguments in both the guilt phase and the penalty phase of Loggins's trial. Loggins's teachers and his psychologist testified that when Loggins experienced one of these fits, he was unaware of what he was doing and was unable to control his conduct.[2] Loggins's attorneys closed both phases of the trial by arguing that Loggins was emotionally troubled and unable to control himself under "normal" circumstances, and that Loggins's mental state at the time of the offense was impaired even more than usual because of the drugs and alcohol that he consumed prior to, and during, the time that he and his companions picked up Ms. Deblieux.
Considered in the context in which it was made, we conclude that the prosecutor merely stated an inference the prosecutor had reasonably drawn from the evidence: that Loggins not only knew what he was doing at the time of the offense, but helped to plan the crime and remembered the details of the murder long after it had taken place. Ex parte Davis,718 So.2d 1166, 1173 (Ala. 1998), cert. denied, 525 U.S. 1179 (1999).
The prosecutor's remark was a proper comment on the evidence. Throughout the trial, Loggins's friends, girlfriends, or acquaintances testified for the State about how Loggins had joked, and had even bragged to them about the killing of the hitchhiker. Thus, the phrase "And throughout every word you've heard from this witness stand in this courtroom this entire week" refers to the people Loggins told about the murder, and who testified at trial, and to those with whom Loggins joked about the killing for weeks after the crime had taken place. The prosecutor's comment was a statement of a proper inference, drawn from this trial testimony, that Loggins had shown no remorse for the killing.Harris v. State, 632 So.2d 503, 536 (Ala.Crim.App. 1992), aff'd,632 So.2d 543 (Ala. 1993), aff'd, 513 U.S. 504 (1995) (wherein this Court held that a reference, during the sentencing stage of the trial, to the defendant's lack of remorse was not improper argument, where testimony introduced at trial had indicated that the defendant's reaction to being informed of her husband's death was so unemotional that she was questioned concerning her reaction); Dobyne, supra, 672 So.2d at 1348-49 (wherein this Court held that a prosecutor's comment regarding the defendant's lack of remorse, made during the penalty phase of the trial, was a comment "on the [defendant's] demeanor when he made his statement to police"). In any event, the prosecutor's comment was not "of such character that a jury would naturally and necessarily construe it as a comment on [Loggins's] silence.' Davis, supra, 718 So.2d at 1173[, cert. denied, 525 U.S. 1179 (1999)]." Maples, supra, 758 So.2d at 21. Therefore, the prosecutor's comment was not error, plain or otherwise.Id.; Dobyne.
 II.
Loggins contends that the trial court improperly denied his motion in limine by which he sought to prevent the State from presenting photographic evidence concerning the mutilation of the victim's body. The trial court allowed the State to introduce *Page 1103 
into evidence approximately 50 photographs of the victim's body; most of them, Loggins says, depict mutilation of the body that was done after the victim had been killed. Loggins contends that these photographs do not prove or disprove any issue that is being litigated, but were offered solely to inflame the passions of the jury.
The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion:
 "`"Generally, a determination of admissibility of evidence rests within the sound discretion of the trial court and will not be disturbed on appeal absent a clear showing of an abuse of discretion." [United States] v. Penn, 721 F.2d 762 [(11th Cir. 1983)]; [United States] v. Dothard, 666 F.2d 498 [(11th Cir. 1982)]; Ward v. State, 440 So.2d 1227 (Ala.Crim.App. 1983); Wicker v. State, 433 So.2d 1190 (Ala.Crim.App. 1983). Evidence is relevant if it has "any tendency to throw light upon the matter in issue, even though such light may be weak and falls short of demonstration." McCain v. State, 46 Ala. App. 627, 247 So.2d 383
(1971); Austin v. State, 434 So.2d 289 (Ala.Crim.App. 1983). "Any fact which has causal connection or logical relation to another fact, so as to make the other fact either more or less probable, is competent or relevant." [Citations omitted.] Further, evidence is relevant if it has any probative value, however slight, upon a matter at issue in the case.'
 "Mitchell v. State, 473 So.2d 591, 594
(Ala.Crim.App. 1985)."
Jennings v. State, 513 So.2d 91, 95-96 (Ala.Crim.App. 1987). Moreover, the trial court may properly admit photographs of the victim's wounds into evidence, even if the photographs are cumulative or the wounds gruesome:
 "`The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim's wounds are admissible despite the fact that they are gruesome or cumulative.' Land v. State, 678 So.2d 201
(Ala.Cr.App. 1995), aff'd, 678 So.2d 224 (Ala. 1996), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996)."
Woodall v. State, 730 So.2d 627, 649 (Ala.Crim.App. 1997), rev'd on othergrounds, Ex parte Woodall, 730 So.2d 652 (Ala. 1998) (emphasis added). The mere fact that the photographs showing the nature and location of the victim's wounds were gruesome and cumulative did not require the trial court to exclude the photographs from evidence:
 "`"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. . . . Finally[,] photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors."'
"Gaddy v. State, 698 So.2d 1100, 1148 (Ala.Cr.App. 1995), aff'd, cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d (1997) (quoting Ex parte Siebert, 555 So.2d 780,783-84 (Ala. 1989), cert. denied, 497 U.S. 1032,110 S.Ct. 3297, 111 L.Ed.2d 806 (1990)).
 "`"[P]hotographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood [v. State], 494 So.2d [124, 141 (Ala.Crim.App. 1985), affirmed, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)]. The fact that a photograph *Page 1104 
is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id."
 `"Ex parte Bankhead, 585 So.2d 112 (Ala. 1991). Accord, Ex parte Siebert, 555 So.2d 780, 783-84
(Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); [Charles W. Gamble, McElroy's Alabama Evidence, § 207.01(2) (4th ed. 1991)]."'
 "Parker v. State, 587 So.2d 1072, 1092-93
(Ala.Crim.App. 1991), aff'd, 610 So.2d 1181 (Ala. 1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993). Photographs that depict the crime scene are relevant and therefore are admissible. Aultman v. State, 621 So.2d 353 (Ala.Crim.App. 1992), cert. denied, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993); Ex parte Siebert, 555 So.2d 780, 783-84
(Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Hill v. State, 516 So.2d 876
(Ala.Crim.App. 1987). Also, autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries. See Dabbs v. State, 518 So.2d 825
(Ala.Cr.App. 1987).
 "`With regard to photographs of the victim taken after he had been shot, even though they are cumulative and pertain to undisputed matters, generally photographs that depict the external wounds on the body of the victim are admissible. Bankhead, 585 So.2d at 109. As we held in Jenkins v. State, 627 So.2d 1034
(Ala.Crim.App. 1992), aff'd, 627 So.2d 1054 (Ala. 1993), "[t]he state [has] the burden of proving that the victim [is] dead, and [photographs are] direct evidence on that point. . . ."'
 "Sockwell v. State, 675 So.2d 4, 21 (Ala.Crim.App. 1993), aff'd, 675 So.2d 38 (Ala. 1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996). . . . Finally,
 "`"`[p]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.' Ex parte Siebert, 555 So.2d 780, 784 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble, McElroy's Alabama Evidence, § 207.01(2) (4th ed. 1991). `The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, . . . demonstrative of undisputed facts, . . . or gruesome. . . .' Williams v. State, 506 So.2d 368, 371 (Ala.Crim.App. 1986), cert. denied, 506 So.2d 372 (Ala. 1987)."
 "`DeBruce v. State, 651 So.2d 599, 607
(Ala.Crim.App. 1993). See also Ex parte Bankhead, 585 So.2d 112 (Ala. 1991).'
 "Hutcherson v. State, 677 So.2d 1174, 1200
(Ala.Cr.App. 1994), rev'd on other grounds, 677 So.2d 1205
(Ala. 1996). See also Giles v. State, 632 So.2d 568
(Ala.Cr.App. 1992), aff'd, 632 So.2d 577 (Ala. 1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Haney v. State, 603 So.2d 368
(Ala.Crim.App. 1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993)."
Wilson v. State, [Ms. CR-97-2569, November 19, 1999] ___ So.2d ___ at ___ (Ala.Crim.App. 1999).
Each of the photographs offered into evidence by the prosecution is gruesome. Some photographs show parts of the victim's body as they were found at the crime scene; other photographs show the left side of the victim's face, with her features essentially erased by blunt-force trauma. Brain tissue is visible in this photograph, as is the victim's collapsed left eye. Other photographs depict the stumps *Page 1105 
of the victim's hands, with the fingers and thumbs amputated. Still other photographs depict the stab wounds to the victim's body, missing teeth, and fragments of the skull. A few photographs depict portions of the victim's remains that were recovered away from her body itself. Each of the photographs, however, offers some information about the fear, pain, and degradation the victim suffered, the hopelessness she must have felt before she died, and the slow and painful manner of her death. Finally, still other photographs depict the victim's amputated fingers and thumbs — fingers and thumbs amputated to prevent her identification and to be kept as souvenirs. One of the victim's finger's ultimately played a role in identifying her murderers.
Each of these photographs was necessary to help communicate important and relevant facts to Loggins's jury. This Court must not lose sight of the fact that this issue is presently before us only because of Loggins's horrific conduct. Because the victim's body was so savagely mutilated, before investigators employed by State law-enforcement agencies and other law-enforcement agencies could photograph it, the only photographs available to the prosecution for use at Loggins's trial were hideous, at best.[3] The trial court did not err in denying Loggins's motion in limine, and the Court of Criminal Appeals did not err in affirming the trial court's denial of that motion in limine.
 III.
Loggins contends that the death penalty was wrongly imposed and that his conviction and sentence are therefore due to be reversed. Loggins's claim relates to the trial court's findings regarding aggravating circumstances and mitigating circumstances. Specifically, Loggins argues that "the trial court abused its discretion" in two ways: (A) By failing to find the existence of two statutory mitigating circumstances — (1) that the offense was committed while Loggins was under the influence of extreme emotional distress or disturbance and (2) that at the time of the offense Loggins's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was "substantially impaired"; and (B) by finding the existence of a statutory aggravating circumstance, specifically, that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. For the purposes of clarity, the claims raised in Loggins's brief as Issues (9) and (10) are discussed below as A and B, respectively.
 A. Whether the trial court erred by not finding the existence of two statutory mitigating circumstances.
Loggins argues that the trial court erred in refusing to find that the capital offense was committed while Loggins was under the influence of extreme mental or emotional disturbance. The trial court's sentencing order, as it pertains to this statutory mitigating circumstance, reads: *Page 1106 
 "2. The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
"Does not exist.
 "Having considered the testimony of Dr. Fleming [the psychological expert for the defense], Dr. Rosecrans [the State's expert, who testified in rebuttal to Dr. Fleming], and all the testimony at both the guilt and sentencing stages of this trial the Court finds that the circumstance does not exist."
(Supp. C. 16-17.) Loggins also asserts that the trial court erred in failing to find that, at the time of the capital offense, Loggins's capacity to appreciate the criminality of his acts or to conform his conduct to the requirements of law was substantially impaired. The trial court's sentencing order, as it pertains to this statutory mitigating circumstance, reads:
 "6. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
"Does not exist.
 "Having considered the testimony of Dr. Fleming and Dr. Rosecrans and all the testimony at both the guilt and sentencing stages of this trial the Court finds that this circumstance does not exist."
Id. at 17.
Having heard the testimony of Dr. Fleming and Loggins's former teachers and counselors on the one hand, and the testimony of Dr. Rosecrans and Loggins's acquaintances on the other hand, the trial judge believed the testimony of Rosecrans and Loggins's acquaintances. "The credibility of witnesses is for the trier of fact, whose finding is conclusive on appeal. [Alabama appellate courts] cannot pass judgment on the truthfulness or falsity of testimony or on the credibility of witnesses.Collins v. State, 412 So.2d 845, 846 (Ala.Cr.App. 1982)." Hope v. State,521 So.2d 1383, 1387 (Ala.Crim.App. 1988).
The evidence supports the trial court's findings. Much of the testimony presented by Loggins related to the rages that he supposedly suffered and their effect on his behavior. However, this evidence was rebutted by other evidence that supported a conclusion that Loggins knew precisely what he was doing when he killed the victim; i.e., that other evidence indicated Loggins thought to clean himself up and to create an alibi the morning after the crime; that Loggins helped to plan the kidnapping of a hitchhiker and that he and the codefendants killed Ms. Deblieux because she resisted the sexual advances of one of the men; and that Loggins remembered small details of the murder for weeks and even months after it took place.
Loggins argues that the trial court's conclusion that he was aware of what he was doing when he murdered the victim necessarily meant that the trial court ignored Dr. Fleming's testimony. We do not agree. Initially, we note that Alabama law allows the finder of fact to reject the testimony of an expert witness:
 "[Alabama appellate courts] have held [that] `[t]he opinions of expert witnesses as to insanity are not conclusive on the jury, but are weighed like other evidence, and the jury may reject all expert testimony, though it is without conflict.' Flenory v. State, 588 So.2d 940, 942 (Ala.Cr.App. 1991), quoting Smith v. Smith, 254 Ala. 404, 48 So.2d 546 (1950).
 "`Moreover, the fact that all witnesses testified for the defense is not a reason to overturn the jury's verdict because "[a] factfinder is not bound by expert testimony `even if all of the witnesses are presented by only one side.'" Ellis v. State, 570 So.2d 744, 752
(Ala.Cr.App. 1990), quoting United States v. Pitts, 428 F.2d 534, 536 (5th Cir.), cert. denied, 400 U.S. 910
[91 S.Ct. 154, 27 L.Ed.2d 149] (1970).'
Hill v. State, 620 So.2d 143, 144 (Ala.Crim.App. 1993)." *Page 1107 
Haynes v. State, 644 So.2d 1281, 1282-83 (Ala.Crim.App. 1994). Furthermore, Loggins's argument ignores the fact that the State presented substantial testimony to rebut Loggins's "insanity" defense.
 B. Whether the trial court erred in finding the existence of a statutory aggravating circumstance.
Finally, Loggins argues that the trial court erred in finding, as an aggravating circumstance, that the murder of Ms. Deblieux was "heinous, atrocious or cruel." Specifically, Loggins argues that the trial court based this finding on the postmortem mutilation of the victim's body. Therefore, Loggins argues, the trial court violated the rule in Godfreyv. Georgia, 446 U.S. 420, 433 (1980) (wherein the United States Supreme Court held that an aggravating circumstance in Georgia's capital-punishment statute that an offense be "outrageously or wantonly vile, horrible or inhuman in that it involves torture, depravity of mind, or an aggravated battery to the victim" required evidence of serious physical abuse of the victim before death), and Ex parte Kyzer,399 So.2d 330, 334 (Ala. 1981) (in which this Court held that the "heinous, atrocious, or cruel" aggravating circumstance "was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."). However, because the trial court clearly based the existence of this aggravating circumstance on actions occurring before the victim died, we must reject Loggins's argument.
The trial court's sentencing order provided, in pertinent part:
 "8. The capital offense was especially heinous, atrocious or [cruel] as compared to other capital offenses:
 "The Court finds, based on the following facts, that this aggravating circumstance does exist.
 "After Ms. Deblieux was hit in the head with a bottle, she was then tackled and brought to the ground where she was repeatedly kicked in the head and body by the defendant and his accomplices. At one point one of them stood on her throat until she gurgled and said `Okay, I'll party' and died.
 "The medical examiner testified that among other injuries, she had every . . . bone in her face broken at least once, and multiple head and body injuries, including a swollen tongue which indicated multiple blows to the head and asphyxiation.
 "And although the 180 stab and incise wounds were committed postmortem, which included removing the lung, these injuries do reflect the shockingly evil conscienceless and pitiless nature of the crime."
(Supp. C. 16.) It is clear, from the plain language in the sentencing order, that the trial court's finding that this offense was "especially heinous, atrocious or cruel" when compared to other capital crimes was based only upon the injuries inflicted on the victim's body before her death.
Furthermore, the trial court's oral charge to the jury during the penalty phase read, in pertinent part, as follows:
 "For a capital offense to be especially heinous, atrocious or cruel, it must be a conscienceless or pitiless crime which is unnaturally torturous to the victim. All capital offenses are heinous, atrocious and cruel to some extent, but not all capital offenses are especially heinous, atrocious or cruel compared to other capital offenses.
 "You should not find or consider the aggravating circumstance unless you find that this particular capital offense involved a conscienceless or pitiless crime which was unnaturally torturous to the victim. This, of course, would not include acts of mutilation of the body of the deceased after her death."
(R. 1014-15.) (Emphasis added.) Thus, the trial court properly instructed Loggins's jury not to consider the postmortem mutilation of Ms. Deblieux's body in determining whether the criteria for the "heinous, *Page 1108 
atrocious or cruel" aggravating circumstance had been met. "It is presumed that trial courts follow their own instructions. Harris v.Rivera, 454 U.S. 339, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981)." Ex parteThomas, 460 So.2d 216, 224 (Ala. 1984). See also Ex parte Trawick,698 So.2d 162, 176 (Ala. 1997), cert. denied, 522 U.S. 1000 (1997); Exparte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935 (1985). Loggins's argument is without merit.
We have carefully reviewed the record of this case, and we have found no error, plain or otherwise. We find no evidence indicating that the sentence of death was imposed as a result of passion, prejudice, or any other arbitrary factor. The trial court instructed the jury not to be influenced by such factors, and juries are presumed to have followed the trial court's instructions. United States v. Tipton, 90 F.3d 861 (4th Cir. 1996), cert. denied, 520 U.S. 1253 (1997); Taylor v. State,666 So.2d 36 (Ala.Crim.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120 (1996).
This Court has independently weighed the aggravating circumstances and the mitigating circumstances, in accordance with Ala. Code 1975, §13A-5-53(b), and we conclude that death is the proper sentence. The trial court found the existence of two aggravating circumstances: (1) The capital offense was committed while Loggins or a codefendant was committing a kidnapping; and (2) the capital offense was especially heinous, atrocious, or cruel when compared with other capital offenses. The trial court also found the existence of two statutory mitigating circumstances: (1) Loggins had no significant history of prior criminal activity; and (2) Loggins was 17 years old when he committed the offense. A weighing of these factors indicates that death is the appropriate sentence.
As Ala. Code 1975, § 13A-5-53(b)(3), provides, we must also address the question whether Loggins's sentence was disproportionate or excessive when compared to sentences imposed in similar cases. Loggins's sentence was neither. See Heath v. State, 455 So.2d 898 (Ala. Crim. App. 1983), aff'd, 455 So.2d 905 (Ala. 1984), aff'd, 474 U.S. 82 (1985); Boyd v.State, 542 So.2d 1247 (Ala.Crim.App. 1988), aff'd, 542 So.2d 1276
(Ala.), cert. denied, 493 U.S. 883 (1989); Callahan v. State,557 So.2d 1292 (Ala.Crim.App. 1989), aff'd, 557 So.2d 1311 (Ala.), cert. denied, 498 U.S. 881 (1990); Land v. State, 678 So.2d 201 (Ala.Crim.App. 1995), aff'd, 678 So.2d 224, 233 (Ala. 1996), cert. denied, 519 U.S. 933
(1996); Payne v. State, 683 So.2d 440 (Ala.Crim.App. 1995), aff'd,683 So.2d 458 (Ala. 1996), cert. denied, 520 U.S. 1148 (1997); Boyd v.State, 715 So.2d 825 (Ala.Crim.App. 1997), aff'd, 715 So.2d 852 (Ala. 1998), cert. denied, 525 U.S. 968 (1998).
The judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
Hooper, C.J., and Maddox, Houston, Cook, See, Lyons, Brown, and Johnstone, JJ., concur.
[1] On cross-examination, Sonja Gray testified that it was Duncan, her boyfriend, and not Loggins, who had told her about killing the hitchhiker.
[2] Defense counsel did not present evidence during the penalty phase of Loggins's trial. Instead, during their closing arguments in the penalty phase, Loggins's attorneys relied upon the evidence they had presented in the defense's case in the guilt phase.
[3] We do not necessarily agree with the following two statements in the opinion of the Court of Criminal Appeals:
 "`"`[P]hotographic evidence, if relevant, is admissible even it has tendency to inflame the minds of the jurors.'"'" 771 So.2d at 1086.
 "As we have previously stated, `"`[p]erpetrators of crimes that result in gruesome scenes have reason to expect that photographs of those gruesome scenes will be taken and admitted into evidence.'"'"
771 So.2d at 1087. As this Court indicated in Ex parte Samra,771 So.2d 1122 at 1122 n. 1 (Ala. 2000), "The purpose of appellate review of a criminal case is to determine whether the defendant received a fair trial. [These statements appear] to assume the very proposition challenged by a defendant on appeal — the validity of his or her conviction."