WISE, Presiding Judge.
The appellant, Bobby Baker, Jr., was convicted of capital murder for the killing of Tracy Baker.[1] The murder was made capital because he committed it during the course of a first-degree kidnapping or an attempt thereof. See § 13A-5-49(a)(l), AIa.Code 1975. Baker was also convicted of first-degree assault, a violation of § 13A-6-20(a)(l), Ala.Code 1975, and discharging a firearm into an occupied dwelling, a violation of § 13A-ll-61(a), Ala. Code 1975. By a vote of 10-2, the jury recommended that he be sentenced to death on the conviction for capital murder. The trial court followed the jury’s recommendation and sentenced Baker to death. It also sentenced him, as a habitual offender, to serve consecutive terms of life in prison on the assault conviction and ten years in prison on the discharging a firearm conviction. See § 13A-5-9(a) Ala. Code 1975. Baker filed a motion for a new trial, which the trial court denied after conducting a hearing. This appeal followed.
Because this is a case in which the death penalty has been imposed, we have reviewed the record for plain error. See Rule 45A, Ala. R.App. P. Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice Baker may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.1985). Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review ... whenever such error has or *591 probably has adversely affected the substantial right of the appellant.”
“[This] plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982)).
The State presented evidence that Baker and the victim, Tracy Baker, were married and had a child together, but they were separated at the time of the murder. They separated at some point, and there was evidence that the victim had been in communication with Joe Norwood, whom she had dated before she married Baker. After an altercation at 727 Hutchins Street during the evening of April 5, 1994, officers found the victim’s dead body in a vehicle a short distance away from Hutch-ins Street. She had been shot five times.
During the afternoon and evening of April 5, 1994, the victim had been at a house on Atlanta Street with some friends. Norwood was also at the house later in the evening. As people were leaving the house, they saw Baker and Norwood fighting approximately one block away from the house. After the fight was broken up, Baker and the victim briefly discussed her relationship with Norwood, and Baker threatened Norwood.
The victim, Darlene Riggins Walker, Norwood, and Sharion Walker, among others, went to Sharion’s house. Shortly thereafter, Baker arrived and started asking Sharion where the victim was. When Sharion refused to tell him, he told her he was carrying an AK-47 and stated that it would kill her. Baker then shot into Shar-ion’s house and forced his way into the house to look for the victim. Ultimately, the victim came out and was screaming at Baker, asking him why he was doing that, and saying she did not want to go with him.
Sharion testified that Baker had the victim and that the victim grabbed her and said she would not go with him by herself because she was afraid he was going to kill her. She also testified that Baker pointed the gun at the victim and forced her to go out of the house with him, even though she was screaming hysterically, shaking, pulling, and asking for help. Sharion testified that a vehicle drove up, and Baker forced the victim into it. She also testified that the victim was screaming for help and saying that Baker was going to kill her. Sharion further stated that Baker tried to force her into the vehicle, but she refused, and that he shot her two times. Baker then got into the vehicle and left with the victim still screaming for help.
Sergeant Fred Fellows of the Dothan Police Department testified that Baker made a statement about the offense on the morning of April 6, 1994. Fellows made notes after the statement and testified as follows concerning that statement:
“And he first told us that he went to the house on Hutchins Street and he shot into it with a .22 caliber rifle. He denied any knowledge of an SKS 7.62 rifle. So I asked him about the shell casings and the bullet hole size, plus, the witness statement. He still denied using the SKS rifle.
“He advised his wife got into the vehicle on her own. And that he then noticed some n_ coming after them in a white car. He said he and Byron Johnson jumped out of the car on Enterprise Street and left Ezedrick Eady and Tracy Baker in the car. He denied shooting his wife. And stated, ‘Them n_must have done it.’
*592 “We advised Baker of a taped statement received from witnesses, plus the statement taken from Byron Johnson who was in the car with Baker. He didn’t believe me. I had Sgt. Gray get the tapes, and I played Johnson’s tape partially. Baker was advised of the information given by Byron Johnson, and he got to hear it himself.
“Baker said, ‘I’ll tell you the truth, you are right about what you said. But I didn’t get the gun.’ He said, ‘Ezedrick Eady and Byron Johnson rented the gun from Donnie Flournoy for two hundred dollars worth of base. Ezedrick drove my car with Byron as a passenger. They let me out at Sharion’s house. I saw Sharion outside and walked up to her. I asked her where Tracy was.’ And Sharion denied any knowledge saying that she wasn’t here. Baker fired a round through the back door breaking the glass out of the storm door stating, ‘This is an AK 47, where is Tracy.’
“ ‘Sharion went inside of the house, and Tracy was there. And they both went back outside, and Tracy got into my vehicle, which pulled up. I argued with Sharion and then shot at her. I did not know I hit her, because she didn’t fall. Sharion stated, “Pop, you shot me.” When I — he was talking about Baker — looked back, she was laying on the ground.’
“Baker said, ‘We drove off and stopped shortly afterward on Enterprise Street. I didn’t mean to kill her. I shot into the car trying to scare her.’ Baker denied knowing that Ezedrick had been hit also. He said he learned this morning that Ezedrick was shot. I, Sgt. Fellows, asked Baker when did he know he had shot Tracy. Baker replied, T didn’t. I heard Byron say, oh, shit, and started running, and I ran behind him.’
“Baker said when Ezedrick stopped, T told Tracy to get out. Tracy said, no, because you are going to kill me. Baker said, no, because I just want to talk. She grabbed the front seat holding on, and said, no, you are going to kill me.’ And Baker said, ‘I got out and just started shooting.’ Baker said, T did everything for that girl, I gave her money, I even bought her roses, but she wouldn’t come back.’ Baker said, ‘When I had a lot of money, she was there. But when I didn’t, she left.’
“During the interview Baker asked what he was charged with. I advised him that he was under arrest for assault first degree and shooting into an occupied dwelling. I showed him both of the warrants that I had signed. He said, ‘I’m not charged with murder?’ And I told him not at this time. The warrant has not been signed. Baker asked if he would be able to make bond. We advised him he would have an arraignment hearing, and that it would be between his lawyer, the District Attorney, and the Judge.
“He asked if he would be charged with capital murder. We advised him that the murder warrant had not been signed, and it would be up to the District Attorney as far as about the charge. I asked Baker if he would give us a taped statement on what he said happened. Baker said, ‘If you’ll let me call my mother.’ I, Sgt. Fellows, told him that I didn’t make deals. I remember Baker having me to check the recorder several times during the interview thinking I was taping him. I advised Baker he had already given us a verbal statement as to what he said had happened. And Baker replied, T can deny that.’ Interview was terminated at that time. And I allowed him to use my phone at that time to call his mother. End of statement.”
*593 (R. 436-40.) Fellows also testified that officers learned during their investigation that Baker had gotten the gun from Donnie Flournoy.
The defense presented previous testimony from Ezedrick Eady, who had been with Baker earlier in the day on April 5, 1994. He testified that they had been drinking and that the victim’s cousin talked to Baker. Afterward, Baker ran toward the house where the victim and Norwood were.
Eady testified that he later drove with Baker to Sharion’s house and was in the vehicle when the victim got into it. He also testified that Baker told the victim he loved her, but he did not ever hear Baker say he was going to kill the victim. Finally, he testified that Baker told him to get out of the vehicle and that he heard shooting.
In rebuttal, the State presented previous testimony from Byron Johnson, who was with Baker and Eady. Johnson testified that Baker had talked about wanting to hurt the victim and Norwood. He also testified that Baker told them where to go to get the gun, directed them to Sharion’s house, and said that he was going to hurt the victim. Finally, Johnson testified that Baker forced the victim into the vehicle, that the victim did not want to get into the vehicle, that the victim was screaming the entire time she was in the vehicle, that the victim was saying that Baker was going to kill her, that the victim was holding on to the window and the front seat when Baker tried to get her out of the vehicle, and that Baker shot her five times.
Baker does not challenge the sufficiency of the evidence. However, we have reviewed the evidence, and we find that it was sufficient to support his conviction for capital murder.
I.
Baker’s first argument is that the trial eourt erred because it did not attempt to determine whether Veniremember R.L.B. “could set aside his opinion that criminal defendants have too many rights and are entitled to too many appeals and could render a verdict based solely on the evidence” or remove him for cause. (Baker’s brief at p. 55-56.) Specifically, he contends that Veniremember R.L.B.’s “responses showed clear bias against criminal defendants.” (Baker’s brief at p. 56.)
During voir dire examination by defense counsel, the following occurred:
“[DEFENSE COUNSEL:] Does anybody think that defendants in cases, any ease, have too many rights? That, you know, going through all this trial and appeals and whatever may happen in a particular case, that that is just way too much?
“(No response.)
“Does anybody believe that?
“(No response.)
“[VENIREMEMBER R.L.B.]: Maybe after conviction. You know, all these rights to appeal and it takes so long to get to the actual sentence.
“[DEFENSE COUNSEL]: Does anyone else feel that way?
“[VENIREMEMBER R.L.B.]: I think you have too many appeals. I think you should cut it down to have three judges to have to see if you can have an appeal, instead of every Tom, Dick, and Harry have an appeal all the time.
“[DEFENSE COUNSEL]: What is your name?
“[VENIREMEMBER R.L.B.]: [R.L.B.]”
(R. 103-04.) Later, during individual voir dire examination, the following occurred:
*594 “[DEFENSE COUNSEL]: [R.L.B.], you stated that you believed that criminal defendants are allowed too many appeals, and, basically, just dragging the process out. Is that what you believe? And we respect your opinion.
“[VENIREMEMBER R.L.B.]: I am sure you do.
“[DEFENSE COUNSEL]: But is that what you believe?
“[VENIREMEMBER R.L.B.]: Yeah.
“[DEFENSE COUNSEL]: Thank you.
“THE COURT: Okay. Thank you.”
(R. 137.) Defense counsel challenged Veniremember R.L.B. for cause, and the trial court denied the challenge.
“The trial judge is given much discretion in determining whether a potential juror should be struck for cause. According to Rule 18.4(e), Ala. R.Crim. P.:
“ ‘When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case.’
[[Image here]]
“Furthermore, in order to determine whether the trial judge’s exercise of discretion was proper, this Court will look to the questions directed to and answers given by the prospective juror on voir dire. Ex -parte Cochran, 500 So.2d 1179 (Ala.1985).”
Holliday v. State, 751 So.2d 533, 535 (Ala.Crim.App.1999). Also, “ ‘[t]he trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.’ ” McNair v. State, 653 So.2d 320, 324 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) (quoting Ex paite Dinkins, 567 So.2d 1313, 1314 (Ala.1990)). Finally,
“[t]he test for determining whether a strike rises to the level of a challenge for cause is ‘whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.’ Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). ‘Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.’ Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). ‘The decision of the trial court “on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.” ’ Nettles, 435 So.2d at 153. In Marshall v. State, 598 So.2d 14 (Ala.Cr.App.1991), this court held that it was not error for a trial court to deny challenges for cause of two jurors who stated that they knew the victim or her family. One veniremember had been employed as a maid by the victim’s family and the other stated that she knew the victim’s family. Marshall, 598 So.2d at 16. This court held that this relationship was not grounds for a challenge for cause as long as the juror indicates that he or she can be fair and impartial. 598 So.2d at 16.”
Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).
Although Veniremember R.L.B. indicated that he thought criminal defendants had too many rights, he specifically referred to rights “after conviction,” such as appeals and the time it takes to get the actual sentence. (R. 103.) However, he did not give any indication that he thought criminal defendants had too many rights before or during trial, and he did not give any indication that his opinions about the delays after conviction would affect his ability to be a fair and impartial juror. Therefore, the trial court could have reasonably concluded that Veniremember R.L.B. could be fair and impartial and that *595 there was not any reason to question him further.
Moreover, the record on appeal indicates that Veniremember R.L.B. did not serve on the jury. Also, Baker has not made any showing that the jury that tried him was not fair and impartial. Accordingly, error, if any, in the denial of his challenge for cause was harmless. See Evans v. State, 794 So.2d 411 (Ala.2000). Cf. Ex parte Colby, 41 So.3d 1 (Ala.2009) (refusing to apply the harmless error rule to a case in which the trial court erred in denying multiple challenges for cause).
II.
Baker’s second argument is that the trial court erroneously admitted a recording of a 911 telephone call into evidence. During the trial, the State played a recording of a 911 telephone call that was made from Sharioris house at the time of the offenses. At trial, Patricia Hall testified that she was the Communications Center manager for the City of Dothan; that, on April 5, 1994, the City recorded communications that came in from 911 or from police, fire, or paramedics; and that it did so in the ordinary course of business. She also testified that such calls were recorded on a reel-to-reel system; that, at the State’s request, she pulled the reels to see if any 911 calls had been made from 727 Hutchins Street to the Communications Center on April 5, 1994; that she found such a call; and that she made a copy of the call for investigators. Hall further testified that she recognized Sandra Jarrett as the dispatcher on the recording.
A.
Initially, Baker contends that the State did not establish a proper predicate to show that the recording qualified as a business record pursuant to Rule 803(6), Ala. R. Evid. Specifically, he asserts that the State did not establish that it was the regular practice of the City of Dothan to make audio recordings of 911 telephone calls. However, he did not present this specific argument to the trial court. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
“The following are not excluded by the hearsay rule, even though the de-clarant is available as a witness:
[[Image here]]
“(6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term ‘business’ as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.”
Rule 803, Ala. R. Evid.
In this case, Hall testified that the City recorded communications that came in from 911 or from police, fire, or paramedics and that it did so in the ordinary course of business. Based on this testimony, the State established that the audio recording of the 911 telephone call was made in the regular course of the City’s business. Therefore, the State established that the recording was a business record pursuant to Rule 803(6), Ala. R. Evid. Accordingly, *596 we do not find that there was any error, much less plain error, in this regard.
B.
Baker also contends that the State did not properly authenticate the contents of the 911 telephone call. Specifically, he asserts that Hall’s testimony did not establish a proper predicate pursuant to the silent witness theory and that Jarrett’s testimony did not establish a proper predicate pursuant to the pictorial communication theory. We question whether Baker presented this specific argument to the trial court. Regardless, we do not find that there was any error, much less plain error, in this regard.
“The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the ‘silent witness’ foundation must be laid. Under the ‘silent witness’ theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the ‘silent witness’ theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong Voudrie [v. State, 387 So.2d 248 (Ala.Crim.App.1980),] test. Rewritten to have more general application, the Voudne standard requires:
“(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded,
“(2) a showing that the operator of the device or process or mechanism was competent,
“(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,
“(4) a showing that no changes, additions, or deletions have been made,
“(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,
“(6) identification of the speakers, or persons pictured, and
“(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.
“On the other hand, when a qualified and competent witness can testify that the sound recording or other medium accurately and reliably represents what the witness sensed at the time in question, then the foundation required is that for the ‘pictorial communication’ theory. Under this theory, the party offering the item must present sufficient evidence to meet the ‘reliable representation’ standard, that is, the witness must testify that the witness has sufficient personal knowledge of the scene or events pictured or the sounds recorded and that the item offered accurately and reliably represents the actual scene or sounds.”
Ex parte Fuller, 620 So.2d 675, 678 (Ala. 1993).
In this case, the State presented evidence that Jarrett was the dispatcher who took the 911 telephone call. Jarrett testified that she worked with the City of Dothan Communications Division; that she was working on April 5,1994; that she had listened to the recording of the 911 tele *597 phone call before she took the stand; that the recording truly and accurately depicted the call she had received; and that there was not any doubt in her mind about that fact. She also testified that that particular call was unusual and that it stood out because there was so much going on with that call. Based on this evidence, the State properly authenticated the recording of the 911 telephone call pursuant to the “pictorial communication” theory. Therefore, Baker’s argument is without merit.
III.
Baker’s third argument is that the trial court erred in admitting evidence about a prior act of domestic violence involving him and the victim on March 22, 1994. Specifically, he contends that, because he did not contest the State’s argument that the victim was not willing to get into the vehicle on April 5, 1994, the evidence was not relevant to prove lack of consent. He also appears to argue that the evidence about the prior act was unduly prejudicial.
Darlene Riggins Walker testified that the victim had been living with her for approximately two weeks before she was killed. She also testified that, on March 22, 1994, while she was driving her vehicle and the victim was in the vehicle with her, she noticed that Baker was behind them in his vehicle. Walker stated that the victim became fearful. She also stated that, at some point, Baker hit her vehicle and that she pulled over.
Walker testified that Baker got out of his vehicle, got into her vehicle, and tried to get the victim out of her vehicle. She also testified that, as Baker tried to pull the victim out of the vehicle, the victim pulled toward her, and she grabbed the victim around the waist. Walker stated that the victim was scared and screaming. She also stated that Baker got into his vehicle and left after people started coming out of their houses and yelling for them to stop. Finally, she stated that the victim was still afraid and was crying when Baker left.
Rule 401, Ala. R. Evid., provides:
“ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”
Rule 402, Ala. R. Evid., provides:
“All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.”
Rule 403, Ala. R. Evid., provides:
“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
Finally, Rule 404(b), Ala. R. Evid., provides:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of *598 any such evidence it intends to introduce at trial.”
This court addressed the admissibility of evidence about collateral bad acts in Irvin v. State, 940 So.2d 331, 344-46 (Ala.Crim.App.2005), as follows:
“ ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’ Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission of collateral-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998). Moreover, ‘ “[a] trial court will not be placed in error for assigning the wrong reason for a proper ruling, if that ruling is correct for any reason.” ’ Peralta v. State, 897 So.2d 1161, 1183 (Ala.Crim.App.2003), affd, 897 So.2d 1227 (Ala.2004) (quoting Nicks v. State, 521 So.2d 1018, 1030-31 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)).
[[Image here]]
“Before the effective date of Rule 404(b) — January 1, 1996 — the exclusionary rule was explained and followed by the Alabama courts. The adoption of Rule 404(b) did not abrogate prior case-law on this topic. Hunter v. State, 802 So.2d 265 (Ala.Crim.App.2000), cert, denied, 802 So.2d 273 (Ala.2001). We note moreover, that the Alabama Supreme Court’s decision in Ex parte Casey, 889 So.2d 615 (Ala.2004), while tightening the use of Rule 404(b) evidence, did not prohibit the use of such evidence. Moreover, given the particular facts of this case, we conclude that the holding in Ex parte Casey does not prohibit the admission of Norman Williams’s testimony in this case.
“In Robinson v. State, 528 So.2d 343 (Ala.Crim.App.1986), this Court discussed the purpose of the exclusionary rule, stating:
“ ‘ “ ‘On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.’ ” Pope v. State, 365 So.2d 369, 371 (Ala.Cr.App.1978), quoting C. Gamble, McElroy’s Alabama Evidence § 69.01 (3d ed.1977). “ ‘This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused’s bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’ ” Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting McElroy’s supra,, § 69.01(1). Thus, the exclusionary rule serves to protect the defendant’s right to a fair trial. “‘The jury’s determination of guilt or innocence should be based on evidence relevant to the crime charged.’ ” Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983); Terrell v. State, 397 So.2d 232, 234 (Ala.Cr.App.1981), cert. denied, 397 So.2d 235 (Ala.1981); United States v. Turquitt, 557 F.2d 464, 468 (5th Cir.1977).
*599 “ ‘ “If the defendant’s commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible.” Saffold v. State, 494 So.2d 164 (Ala.Cr.App.1986). The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Cr.App.1984); Scott v. State, 353 So.2d 36 (Ala.Cr.App.1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. “ ‘Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.’ ” Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App.1985), quoting United States v. Turquitt, supra at 468-69. “ ‘ “Prejudicial” is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.’ [Citation omitted.] ‘Of course, “prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.” ’ ” Averette v. State, supra, at 1374.’
“528 So.2d at 347. See also Hooker v. State, 840 So.2d 197, 213-14 (Ala.Crim. App.2002).”
The Alabama Supreme Court reiterated the principles set forth in Irvin and Robinson governing the admissibility of collateral bad act evidence in Ex parte Jackson, 33 So.3d 1279 (Ala.2009). It also emphasized that, even if evidence about a collateral bad act falls within one of the exceptions to Rule 404(b), Ala. R. Evid., the State must still demonstrate that the evidence is reasonably necessary to its case.
When it reversed Baker’s previous conviction and sentence in this case, the Alabama Supreme Court addressed the admissibility of evidence about prior acts of domestic violence as follows:
“Intent to terrorize Tracy was an essential element of the capital kidnap-murder as charged in the indictment against the defendant in the case now before us. See § 13A-6-43(a)(5) and § 13A-5-40(a)(1), Ala.Code 1975. The defendant also contested this essential element and accentuated it as an issue. Because recent acts of domestic violence by the defendant against Tracy would have tended to prove an ongoing process of terrorizing her in order to control her which culminated in the events on the day of her death, evidence of such incidents, if not otherwise inadmissible, was and would have been relevant to the *600 contested issue of the defendant’s intent to terrorize Tracy.”
Ex parte Baker, 906 So.2d at 284. However, the Alabama Supreme Court reversed Baker’s convictions based on the erroneous admission of inadmissible hearsay — i.e., out-of-court declarations the victim made to other people about Baker’s prior acts of domestic violence toward her.
In this case, during his opening statement, defense counsel argued that Baker did not intend to kidnap or terrorize the victim. Counsel also argued that the offense was not a capital offense because he did not kidnap or terrorize the victim. Rather, he argued that he committed the offense during the heat of passion. Thus, Baker’s intent to kidnap and terrorize the victim was a contested issue. Also, unlike in the previous trial, the State did not elicit hearsay about Baker’s previous acts of domestic violence toward the victim. Instead, Walker simply testified about her observations on March 22, 1994. Under these circumstances, evidence about the incident on March 22, 1994, was relevant to the contested issue of Baker’s intent to kidnap and terrorize the victim and was more probative than it was prejudicial to his defense because it was reasonably necessary to the State’s case and was plain, clear, and conclusive. Therefore, Baker’s argument to the contrary is without merit.
IV.
Baker’s fourth argument is that the trial court erred in allowing the prosecutor to play a recording of a 911 telephone call and to display photographs during his opening statement. He objected to the playing of the recording of the 911 telephone call during the prosecutors’s opening statement on the ground that it had not been put into evidence. However, when the prosecutor showed the photographs during his opening statement, defense counsel objected, but not on the ground that they had not yet been admitted into evidence. Therefore, we review the depiction of those photographs during the opening statement for plain error. See Rule 45A, Ala. R.App. P.
When it previously reversed Baker’s conviction and sentence, the Alabama Supreme Court also stated, in dicta:
“For the erroneous admission of the inadmissible hearsay, the defendant’s capital murder conviction must be reversed and the case remanded for a new trial. Two caveats may prevent other errors upon the retrial.
[[Image here]]
“... [T]he opinion of the Court of Criminal Appeals in this case, 906 So.2d 210, expressly approves the prosecutor’s showing photographs to the jurors during his opening statement, before the photographs had been admitted into evidence. While the trial judge’s allowing this tactic did not constitute plain error in this case, the tactic certainly should not be encouraged. Except by agreement of the parties, jurors should not see or hear evidence before its admission as such. See Addin v. State, 790 So.2d 975,1004 (Ala.Crim.App.2000).”
Ex parte Baker, 906 So.2d at 288.
In Part II of this opinion, we specifically found that the trial court did not err in admitting the recording of the 911 telephone call into evidence. We have also reviewed the photographs, and we do not find that the trial court committed error, much less plain error, in admitting them into evidence. Although, as the Alabama Supreme Court previously stated, “the tactic certainly should not be encouraged,” we do not find that the prosecutor’s playing of the 911 recording and displaying of photographs during his opening statement constituted error, much less plain error, in this case.
*601 v.
Baker’s fifth argument is that the trial court abused its discretion when it refused to allow the defense to read the redirect examination of Eady from a previous proceeding into evidence. After the defense read into evidence the direct examination of Eady, who was unavailable for trial, the prosecutor indicated that the State did not have any cross-examination it wished to present. The defense then sought to present the remainder of Eady’s testimony, but the prosecutor objected, and the trial court sustained that objection.
“The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). Initially, we note that Baker did not make an offer of proof as to what he expected the redirect examination to show. See Rule 103(a)(2), Ala. R. Evid.; Knight v. State, 710 So.2d 511 (Ala.Crim.App.1997). Also, to the extent Baker relies on Rule 16.6, Ala. R.Crim. P., which addresses the admissibility of deposition testimony, we note that it does not appear that Eady originally testified by deposition. Rather, although the parties referred to the prior proceeding as a deposition before the jury, it appears, based on comments by defense counsel, that the defense was reading Eady’s testimony from Baker’s previous trial and that Rule 16.6, Ala. R.Crim. P., would not apply to this case. Further, because the State chose not to introduce the cross-examination, the redirect examination may have been out of context and may have served only to confuse the jury. Finally, Baker has not alleged or shown how the redirect examination would have been helpful to his case or how excluding it was detrimental to his case. Under these circumstances, we do not find that the trial court exceeded its discretion in this regard.
VI.
Baker’s sixth argument is that the trial court erred in allowing the prosecutor to read into evidence, during the guilt phase of the trial, a letter he had written to the victim’s mother in which he stated that he would plead guilty and seek the death penalty. Specifically, he appears to contend that the letter improperly made punishment a consideration during the guilt phase of the trial.
Sarah Odom, the victim’s mother, identified a letter she received from Baker in May 1994. In that letter, Baker wrote:
“Dear Miss Sarah, I am sorry for what happened. I don’t know what to say. I died Apr. 5. I have no will to live. The reason I am writing you is to tell you what I have decided to do. This was my decision I thought of on my own. My main concern now is Destiny.... I told my aunt to petition the Court to adopt Destiny, and she did. I am not doing this to hurt anyone. I think it is best for her. So you should be getting something in the mail real soon. You can come and get her any time you want. I hope we could settle this among ourselves. If not, we will go to court. We have already hired a lawyer on this matter and he is working on it. I am the baby[’s] biological father and I am going to express my concerns about Destiny’s welfare. I know you are a good person but I think my side will give her a better life. My mom was going to call and tell you but I said no I will write and tell you myself. I know you are having a hard time dealing with what happened. I am to[o], I am going to plead guilty and ask for the death *602 penalty. But before I do, I want to know my child is taken care of so that’s how I came to my decision. A life given for a life taken is only fair.”
(C.R. 504.)
After reviewing the letter, we find that it was an admission of guilt by Baker. See Rule 801(d)(2)(A), Ala. R. Evid. Also, during the guilt phase, the State did not use the letter in any way to suggest its opinion as to the proper punishment. Rather, it argued that it was admissible to show Baker’s consciousness of guilt and to rebut his contention that he is mentally retarded and could not form the intent to commit capital murder. Finally, we note that the trial court explained to the jury that the trial would be conducted in two phases — a guilt phase and, if Baker was found guilty, a penalty phase. Under these circumstances, we do not find that there was any reversible error in this regard.
VII.
Baker’s seventh argument is that the trial court erred in overruling his objection to the admission of the victim’s statements. His entire “argument” in this regard consists of a brief quote from the opinion in which the Alabama Supreme Court’s reversed his previous convictions and sentences for these offenses. Specifically, Baker quotes the following:
“ ‘The Court of Criminal Appeals correctly held that the witnesses’ testimony, insofar as it purported to recount Tracy’s out-of-court declarations purporting to describe acts of domestic violence against her by the defendant, was inadmissible hearsay.’ Ex parte Baker, 906 So.2d 277, 284 (Ala.2004).”
(Baker’s brief at pp. 65-66.) Because he did not set forth the specific facts upon which he bases his claim, we do not believe he has complied with the requirements of Rule 28(a)(10), Ala. RApp. P., with regard to this issue.
Moreover, we note that Baker may have intended to refer to hearsay statements by the victim about his prior acts of domestic violence against her, such as were admitted during the previous trial and that served as the basis for the Alabama Supreme Court’s reversal of his previous convictions and sentences in this matter. However, as we explained in Part III of this opinion, the State did not elicit hearsay about Baker’s previous acts of domestic violence toward the victim during this trial. Therefore, any argument in that regard is without merit.
VIII.
Baker’s eighth argument is that the trial court erred in admitting evidence about his prior bad acts. Once again, his entire “argument” in this regard consists of a brief quote from the opinion in which the Alabama Supreme Court reversed his previous convictions and sentences for these offenses. Specifically, Baker quotes the following:
“‘Evidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant.’ Ex parte Cofer, 440 So.2d at 1124. As in James v. State, supra, the jury argument by the State emphasizing the erroneously admitted hearsay exacerbated the prejudice. Thus, this Court is not ‘able to declare a belief that [the error] was harmless beyond a reasonable doubt.’
“Ex parte Baker, 906 So.2d 277, 288 (Ala.2004) citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).”
(Baker’s brief at p. 66.) Because he did not set forth the specific facts upon which he bases his claim, we do not believe he has complied with the requirements of *603 Rule 28(a)(10), Ala. R.App. P., with regard to this issue.
Moreover, we note that Baker may have intended to refer to the evidence about the incident on March 22, 1994. However, for the reasons set forth in Part III of this opinion, the trial court properly admitted the testimony about the incident. Therefore, any argument to the contrary is without merit.
IX.
Baker’s ninth argument is that the trial court erred in allowing a psychologist to volunteer information.
A.
First, Baker contends that Dr. Doug McKeown volunteered that he was charged with a sex crime at age sixteen. However, he did not object to the comment at trial. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
Baker correctly argues that McKeown testified that he had evaluated Baker in 1989 “for the juvenile system associated with an alleged sexual charge done at the time [Baker] was sixteen years old.” (R. 479-80.) However, McKeown made the statement during a hearing before the court and outside of the presence of the jury. Therefore, such evidence was not before the jury. Accordingly, we do not find that there was any plain error in this regard.
B.
Second, Baker contends that McKeown volunteered the information in the emphasized testimony during the following exchange:
“[PROSECUTOR:] Can you tell the ladies and gentlemen of the jury, Dr. McKeown, in other words, as you sit here today, any doubt in your mind, are you satisfied beyond all reasonable doubt or even all doubt in your opinion that Bobby Baker, Jr., is not mentally retarded?
“[MCKEOWN:] Yes, sir. And there is one additional bit of information that really hasn’t been asked.
“[DEFENSE COUNSEL]: Object. Nonresponsive.
“THE COURT: Overruled.
“[MCKEOWN]: I completed an achievement test with him in 2006 related to reading, just with regard to word recognition, and he scored an eleventh grade level, which would again be indicative of someone functioning far above what would be considered retardation.”
(R. 54-55) (emphasis added).
During the penalty phase of the trial, the defense presented testimony from McKeown in an attempt to establish that Baker is mentally retarded. McKeown testified that he evaluated Baker in 1989, in 1995, and in 2006. In 1989, he did not administer an IQ test, but indicated that he believed Baker was functioning in the very low average range, which would equate to an IQ in the seventy-eight to eighty-eight range. In 1995, he administered an IQ test and found that Baker had a full-scale IQ of sixty-eight, which is at the very upper end of the mild range of mental retardation. Finally, he administered an IQ test in 2006 and found that Baker had a full-scale IQ of 81, which is in the low average range of functioning.
The defense questioned McKeown about the change in Baker’s IQ score, asked about additional information he may have used when performing the 2006 evaluation, and insinuated that he may have been motivated to testify in favor of the prosecution because he had a contract with the State of Alabama in 2006. The State also asked questions concerning the change in Baker’s IQ score. Afterward, the ex *604 change quoted above occurred. Although MeKeown’s comment did go beyond what the prosecutor asked him at that point in time, it was a reasonable comment in light of questioning by both parties about the discrepancy between Baker’s IQ scores. Because both parties questioned Baker extensively about what additional information he used in his 2006 evaluation, we do not find that the trial court erred to reversal in allowing him to provide the information set forth above.
X.
Baker’s tenth argument is that the trial court erred in instructing the jury on the especially heinous, atrocious, or cruel aggravating circumstance.
“In Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court’s application of the ‘especially heinous, atrocious or cruel’ aggravating circumstance because this Court’s application of it provided a ‘principled way to distinguish’ cases in which the death penalty is appropriately imposed from cases in which it is not. Id. at 1513, 1515 (upholding our application of Ala.Code 1975, § 13A-5-49(8) and quoting Godfrey [v. Georgial], 446 U.S. [420,] 431, 100 S.Ct. 1759 [(1980)]). The Eleventh Circuit emphasized that the Alabama appellate courts’ interpretation of § 13A-5-49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined ‘especially heinous, atrocious or cruel’ to include only ‘those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’ Lindsey v. Thigpen, at 1514 (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981)) (emphasis added).”
Ex parte Clark, 728 So.2d 1126, 1138 (Ala. 1998) (footnote omitted). In accordance with these principles, the especially heinous, atrocious, or cruel aggravating circumstance has been narrowly defined.
“In Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), this Court held that the standard applicable to the ‘especially heinous, atrocious, or cruel’ aggravating circumstance under § 13A-5-49(8) is that for a crime to fit within that section it must be one of ‘those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’ ”
Ex parte Bankhead, 585 So.2d 112, 124 (AIa.1991), rev’d on other grounds, 625 So.2d 1146 (Ala.1993).
“One factor this Court has considered particularly indicative that a murder is ‘especially heinous, atrocious or cruel’ is the infliction of psychological torture. Psychological torture can be inflicted where the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture ‘must have been present for an appreciable lapse of time, sufficient enough to cause prolonged or appreciable suffering.’ Norris v. State, 793 So.2d 847, 861 (Ala.Crim.App.1999).”
Ex parte Key, 891 So.2d 384, 390 (Ala.2004). See also White v. State, 587 So.2d 1218, 1234 (Ala.Crim.App.1990) (noting that “[e]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, and cruel. Ex parte Whisenhant, 555 So.2d 235, 243-44 (Ala.1989), cert. denied, [496] U.S. [943], 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).”).
Sharion Walker testified that, when Baker came into her house to get the victim, the victim was shaking and screaming, asking why he was doing it, and saying she did not want to go with him. She *605 also testified that the victim said that she would not go with him by herself, that she grabbed and pulled on her, and that she asked for help. Walker testified that the victim said that Baker was going to kill her. Finally, she described the victim as being hysterical.
Byron Johnson stated that, while she was in the vehicle, the victim was holding onto the window and the front seat. He also stated that she was screaming and saying that Baker was going to kill her.
Dr. Alfredo Parades performed the autopsy on the victim and testified about his observations and conclusions. He testified that the victim had been shot five times on the right side — to her chest, abdomen, hip, thigh, and abdominal wall — and that she also had a wound where a bullet had grazed her. He also testified that he believed that the victim was alive when she sustained each gunshot wound. Parades testified that the gunshot wounds caused some ripping of the flesh on the victim’s thigh and pubic area, fractured her right femur and some ribs, went across her superficial abdominal wall, and caused massive internal injuries and that the wounds would have been very painful. Finally, he testified that the victim had other cuts and scrapes.
Thus, the State presented evidence that the victim experienced great fear before Baker shot her and that she sustained five gunshot wounds that caused extensive injuries and that would have been very painful while she was still alive. Such evidence was sufficient to support a finding that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses and the trial court’s decision to give such an instruction. Therefore, Baker’s argument is without merit.
XI.
Finally, pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of Baker’s conviction and sentence of death. Baker was indicted for and convicted of capital murder during the course of a first-degree kidnapping or an attempt thereof. See § 13A-5-40(a)(l), Ala.Code 1975.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5 — 53(b)(1), Ala. Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved three aggravating circumstances— 1) Baker committed the capital offenses while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a kidnapping, see § 13A-5-49(4), Ala.Code 1975; 2) the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Aa. Code 1975; and 3) Baker committed the offense while he was under sentence of imprisonment, see § 13A-5A9(1), Aa. Code 1975. The trial court found that there was one statutory mitigating circumstance in this case — Baker’s age at the time of the offense, see § 13A-5-51(7), Aa. Code 1975. It also made the following findings as to nonstatutory mitigating circumstances:
“There was also some evidence as to the defendant having mild mental retardation. However, the medical evidence is in dispute as to these issues and the Court finds that his mental retardation was not sufficient enough to warrant any excuse for this crime.”
(C.R. 444.) The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and cor *606 rectly sentenced Baker to death. The record supports its decision, and we agree with its findings.
Section 18A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A-5-5S(b)(3), Ala. Code 1975, we must determine whether the sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. Baker committed the murder during the course of a first-degree kidnapping or an attempt thereof. Similar crimes are being punished by death throughout this state. See Lewis v. State, 57 So.3d 807 (Ala.Crim.App.2009); Gissendanner v. State, 949 So.2d 956 (Ala.Crim.App.2006); Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003); Peoples v. State, 510 So.2d 554 (Ala.Crim.App.1986), aff'd, 510 So.2d 574 (Ala.1987). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected Baker’s substantial rights, and we have not found any. See Rule 45A, Ala. RApp. P.
Accordingly, we affirm Baker’s convictions and sentences.
AFFIRMED.
WELCH, WINDOM, and MAIN, JJ., concur. KELLUM, J., concurs specially, with opinion.

. Baker was originally convicted of the capital offense of kidnapping-murder and sentenced to death in 1995. This court affirmed his conviction, but the Alabama Supreme Court reversed this court’s judgment and remanded the case for a new trial. See Baker v. State, 906 So.2d 210 (Ala.Crim.App.2001), rev'd, 906 So.2d 277 (Ala.2004).