KELLUM, Judge.
The appellant, Elijah Ray Frazier, was convicted of two counts of capital murder in connection with the murder of Keon Sankey. The murder was made capital (1) because it was committed during the course of a robbery, see § 13A-5-40(a)(2), Ala. Code 1975, and (2) because Frazier shot Sankey while Sankey was inside a vehicle, see § 13A-5-40(a)(17), Ala. Code 1975. The trial court sentenced Frazier to life imprisonment without the possibility of parole for each conviction.[1]
The evidence adduced at trial indicated the following. Around 4:00 p.m. on November 20, 2013, Sankey drove to the home of Aaron Simmons, who had agreed to help Sankey purchase marijuana. When Sankey arrived, Simmons was sitting in the front passenger seat of Eddie Osborne's automobile parked in front of Simmons's house; Osborne was in the driver's seat. Sankey parked his vehicle and walked to the passenger side of Osborne's vehicle. Simmons opened the passenger-side door, and Sankey spoke with Simmons and Osborne. Both Simmons and Osborne testified that they then heard a loud noise and saw Frazier and Rodricko Davis[2] hit Sankey in the head from behind with pistols and say "give it up." (R. 126.) Sankey said "I ain't got nothing" and then dove into Osborne's vehicle, crawled across Simmons and Osborne, and exited the other side of the vehicle through the driver's door. (R. 126.)
Osborne and Simmons both testified that, as Sankey was crawling across them, Davis pointed his pistol inside the vehicle and pulled the trigger but the pistol did not fire. Osborne said that Davis pulled the trigger at least one more time but that the pistol still did not fire; Simmons said that Davis pulled the trigger "[a] bunch of times" but that the pistol never fired. (R. 203.) At that point, the testimony reflected, Simmons grabbed Davis and the two struggled over Davis's pistol. According to Simmons, Davis said: "I don't want to shoot you, but I'll shoot you if I have to." (R. 204.) As Simmons and Davis struggled, Sankey and Osborne exited Osborne's vehicle on the driver's side. Frazier then ran around to the driver's side of Osborne's vehicle.
Simmons testified that, at that point, he heard a gunshot, saw Frazier grab Sankey and search his pockets, and then saw Sankey run to his car. Osborne, however, testified that Frazier did not search Sankey but that Sankey turned and ran to his car before Frazier got close to him. As Sankey was running to his car, Osborne said, he heard Davis say "shoot him" and Frazier *373 then shot Sankey. (R. 129.) Sankey continued to his car, and both Simmons and Osborne testified that, after Sankey got into his vehicle, Frazier, who followed him, opened the driver's side door and shot Sankey again. Sankey then drove away. Osborne testified that Frazier shot Sankey once while Sankey was in his vehicle; Simmons testified that he thought Frazier had shot at Sankey "two or three times" while Sankey was in his vehicle and as Sankey drove away. (R. 206-07.) After Sankey fled, Frazier and Davis also fled.
Although Sankey managed to flee the attack, he crashed his vehicle a short distance away. He was subsequently transported to a local hospital where he underwent emergency surgery to repair the femoral artery in his left thigh. He died several hours later. Medical examiner Alfredo Paredes testified that he performed the autopsy on Sankey. Dr. Paredes testified that Sankey's cause of death was multiple gunshot wounds. Specifically, Dr. Paredes testified that Sankey was shot twice. One shot entered the back of Sankey's right leg, traveled upward and to the left, and exited the left groin area. The other shot entered the outer portion of Sankey's left forearm, traveled through the forearm and exited the inner forearm, and then entered the front of Sankey's left thigh and exited the back of the thigh. Dr. Paredes found no gunpowder stippling around the wounds. Dr. Paredes also testified that there was internal bruising under the scalp on Sankey's right temple but that there were no noticeable external injuries in that area.
At the scene of the shooting, police found three shell casings. In Sankey's car, police found a fired bullet lodged in the driver's seat. There was also a bullet hole in the door frame on the driver's side of the car. The shell casings were nine-millimeter Luger casings; the bullet was also a nine-millimeter Luger bullet. Expert testimony indicated that all three shell casings had been fired from the same weapon. Several fingerprints were lifted from Sankey's car, most of which belonged to Sankey himself, but three of which belonged to Kertavious Thomas, who testimony indicated was a friend of Sankey's. Neither Frazier's fingerprints nor Davis's fingerprints were found on Sankey's car. Additionally, in one of Sankey's pants pockets, police found $2,660.
Michael Knox, a forensic consultant, testified for the defense. Knox testified that he examined the crime-scene photographs, police reports, and laboratory reports, including the autopsy report, related to the shooting of Sankey. Knox testified that, in his opinion, the shot that passed through Sankey's left arm and left thigh and had lodged in the driver's seat of Sankey's vehicle had to have been fired from a firearm that was "inside the vehicle and would be pointing downward at him at a fairly close range" (R. 395) so that there would have been "evidence of gunpowder and gun residue" on Sankey if Sankey had been seated inside his vehicle at the time of the shot. (R. 396.) The lack of gunpowder stippling around the wounds, Knox concluded, indicated that Sankey was not inside his vehicle at the time of that shot. Knox also testified that the absence of any external injuries on Sankey's head indicated that he had not been hit with a pistol, as Simmons and Osborne had testified.
After both sides rested and the trial court instructed the jury on the applicable principles of law, the jury convicted Frazier of both counts of capital murder as charged in the indictment. This appeal followed.
I.
Frazier first contends that the trial court erred in allowing the lead investigator, *374 Detective Guy Naquin with the Montgomery Police Department, to testify that Frazier's sister had given him a handwritten letter.
Before trial, Frazier filed a motion in limine to prohibit the State from introducing the letter into evidence on the ground that the letter could not be authenticated. The trial court deferred ruling on the motion. The record reflects that the letter was never offered into evidence by the State, nor did the State present any testimony regarding the contents of the letter or who authored the letter. Outside the presence of the jury, the State posited that Frazier had written the letter and had given it to D'Angela Richardson who had, in turn, given it to Frazier's sister, Brandy, who had then given it to Det. Naquin. In the letter, Frazier stated that Davis was the person who had shot Sankey but that he owned the gun that was used to shoot Sankey, and he requested that the letter be shown to his family and "the police or whoever can free me." (R. 307.) The record indicates that the State had subpoenaed Richardson to testify about the letter but that she failed to appear the first day of trial. The trial court then issued a warrant for Richardson's arrest.
Det. Naquin was the State's last witness during its case-in-chief. During direct examination, the prosecutor asked Det. Naquin if he had ever had contact with any of Frazier's family members, and Det. Naquin stated that he had had contact with Frazier's sister, Brandy. The prosecutor then asked Det. Naquin what the contact with Brandy was about, and Frazier objected. Frazier argued that the letter could not be authenticated through Det. Naquin. The State indicated that it was not going to introduce the letter into evidence or reveal the contents of the letter to the jury during Det. Naquin's testimony but that it was simply going to ask Det. Naquin if he had received the letter and ask him to identify the letter. The trial court indicated that it would allow the State to question Det. Naquin regarding whether he had received the letter and how he had received the letter because the letter had been received as part of his investigation. Frazier argued that allowing Det. Naquin to testify that he had received the letter without the letter being admitted or its contents revealed to the jury would leave the jury wondering about the letter, which, he said, would be prejudicial to him. The trial court disagreed and overruled Frazier's objection.
Det. Naquin then testified that on December 17, 2013, Brandy Frazier had come to his office unannounced and had given him a handwritten letter. Det. Naquin identified State's Exhibit 38 as the letter he had received from Brandy. Det. Naquin testified that when Brandy gave him the letter she told him where she had gotten it. At that point, the trial court stopped the State's questioning regarding the letter. At the conclusion of Det. Naquin's testimony, a lunch break was taken. Before the break, the State indicated that it was going to continue its search for Richardson over the break but that, if it could not locate her, the State would rest its case. The State was apparently unable to locate Richardson, and it rested its case after the break, without introducing the letter.
Although Frazier admits that the letter was not admitted into evidence and that neither the contents of the letter nor the purported author of the letter were revealed to the jury, he argues that Det. Naquin's testimony that he had received the letter was irrelevant and inadmissible and prejudiced him. Specifically, Frazier argues that "[t]he mere mention of the letter ... created a 'McGuffin' effect often used in movies, whereby the mystery of the letter's contents casts a nefarious and *375 false shadow of guilt upon Frazier" (Frazier's brief, p. 17) and that "the mention of the letter alone was indeed a slick device by the State, made to induce an emotional bias against Frazier, not one based on fact." (Frazier's brief, p. 20.) We disagree.
"The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins, 771 So.2d 1093, 1103 (Ala. 2000). Additionally, "[t]rial courts are vested with considerable discretion in determining whether evidence is relevant, and such a determination will not be reversed absent ... an abuse of discretion." Hayes v. State, 717 So.2d 30, 36 (Ala. Crim. App. 1997).
" Rule 402, Ala. R. Evid., provides that '[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State.' Rule 401, Ala. R. Evid., defines 'relevant evidence' as 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' 'Alabama recognizes a liberal test of relevancy, which states that evidence is admissible "if it has any tendency to lead in logic to make the existence of the fact for which it is offered more or less probable than it would be without the evidence." ' Hayes[ v. State], 717 So.2d [30,] 36 [ (Ala. Crim. App. 1997) ], quoting C. Gamble, Gamble's Alabama Evidence § 401(b) [ (5th ed. 1996) ]. '[A] fact is admissible against a relevancy challenge if it has any probative value, however[ ] slight, upon a matter in the case.' Knotts v. State, 686 So.2d 431, 468 (Ala. Crim. App. 1995), aff'd, 686 So.2d 486 (Ala. 1996). Relevant evidence should be excluded only 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' Rule 403, Ala. R. Evid."
Gavin v. State, 891 So.2d 907, 963-64 (Ala. Crim. App. 2003).
The record indicates that, at the time Det. Naquin testified, the State was planning to introduce the letter into evidence if it could lay the proper predicate. The State had subpoenaed Brandy Frazier and D'Angela Richardson[3] and was actively searching for Richardson throughout the trial after she had failed to appear. Det. Naquin's testimony was part of the predicate to admit the letter and was, thus, relevant at the time his testimony was offered. Although the State was ultimately unsuccessful in locating Richardson and, as a result, was unable to offer the letter into evidence, that did not render irrelevant Det. Naquin's testimony about his receipt of the letter. Nor do we believe that Det. Naquin's testimony that he had received the letter was, alone, prejudicial to Frazier. Frazier speculates that the mere mention of the letter suggested his guilt; however, nothing in the record supports such speculation. On the contrary, after thoroughly reviewing the record, we conclude that Det. Naquin's limited testimony was, at most, innocuous and in no way prejudicial to Frazier. Therefore, the trial court did not err in allowing Det. Naquin to testify that he had received a letter from Frazier's sister.
*376 II.
Frazier next contends that the trial court erred in refusing to admit into evidence a transcript of the prior testimony of Simmons and Osborne given during the trial of his codefendant, Rodricko Davis.
The record reflects that Frazier cross-examined Simmons and Osborne about their prior trial testimony, using the transcript of that prior testimony to highlight what Frazier believed were inconsistencies between the prior testimony and the testimony at Frazier's trial. Frazier asked Simmons several questions about his prior testimony. Simmons denied having made one of the prior statements about which he was questioned, could not recall some of the prior statements about which he was questioned, and admitted making three of the prior statements about which he was questioned.[4] The record indicates that Frazier asked Osborne only two questions about his prior testimony, and, in both instances, Osborne admitted to having made the statements in his prior testimony.[5] (R. 137-38.)
At the conclusion of the State's case-in-chief, but before the State formally rested, Frazier notified the trial court that he intended to introduce into evidence a transcript of the entirety of Simmons's and Osborne's prior trial testimony. The trial court indicated that it did not believe the transcript was admissible, but the trial court stated that if Frazier could provide the court with law indicating that the transcript was admissible, the trial court would allow it. After the State rested, Frazier moved for a judgment of acquittal, which was denied. Frazier then presented his sole defense witness, Michael Knox. After Knox's testimony, Frazier rested his case and renewed his motion for a judgment of acquittal. When arguing his motion for a judgment of acquittal, Frazier moved to enter into evidence the transcript of Simmons's and Osborne's prior trial testimony and argued that the Alabama Supreme Court's opinion in Hooper v. State, 585 So.2d 137 (Ala. 1990), allowed for the admission of a transcript of prior trial testimony. The State objected, and the trial court refused to admit the transcript.[6]
On appeal, Frazier argues that the transcript of Simmons's and Osborne's prior trial testimony was admissible as substantive evidence and that the trial court erred in refusing to admit the transcript. As he did in the trial court, Frazier relies on *377 Hooper, supra.[7] Frazier's argument confuses and conflates two separate legal principles: (1) whether a prior inconsistent statement may be used as substantive evidence as well as impeachment evidence and (2) whether a party may present extrinsic proof of a prior inconsistent statement.
Frazier is correct that a prior inconsistent statement by a witness, if made under oath at a prior trial, may be used as substantive evidence, and not merely as impeachment evidence. In Hooper, the defendant was tried and convicted of two counts of second-degree rape of his daughter. His convictions were reversed on appeal. On retrial, the victim recanted her story and testified that the defendant had not raped her. The prosecutor questioned the victim about her testimony in the previous trial and requested that the trial court instruct the jury that the victim's prior inconsistent testimony could be considered substantive evidence of the defendant's guilt. The trial court gave the requested instruction, and the Alabama Supreme Court upheld the instruction. The Court noted that the general rule at that time was that prior inconsistent statements of a witness could be considered only as impeachment evidence and not as substantive evidence of guilt. The Court, however, changed that general rule and held "that a prior inconsistent statement of a witness who takes the stand and is available for cross-examination may be used as substantive evidence if the prior statement was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." Hooper, 585 So.2d at 140. The holding in Hooper was subsequently codified in Rule 801(d)(1)(A), Ala. R. Evid.
In Hooper, the prior inconsistent testimony was elicited through questioning of the victim. Nothing in the opinion in Hooper indicates that the prosecutor had offered into evidence a transcript of the victim's prior testimony, nor does the opinion in Hooper speak to the issue of the admissibility of a transcript of a witness's prior testimony as extrinsic proof of a prior inconsistent statement. Hooper stands only for the proposition that a prior inconsistent statement made under oath in a prior trial may be used as substantive evidence and not just impeachment evidence.
In this case, however, the trial court did not rule that Simmons's and Osborne's prior inconsistent statements, as brought out on cross-examination, could not be used as substantive evidence. The trial court's only ruling in this case was that the transcript of Simmons's and Osborne's prior testimony was not admissible as extrinsic proof of their prior statements. That ruling was correct.
With respect to Osborne, as noted above, Frazier asked only two questions about Osborne's prior trial testimony, and Osborne admitted that he had made both prior statements. Rule 613(b), Ala. R. Evid., provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness has been confronted with the circumstances of the statement with sufficient particularity to enable the witness to identify the statement and is afforded an opportunity to admit or to deny having made it." The Advisory Committee's Notes to that rule state: "Nothing in Rule 613(b) affects that line of authority providing that a witness's acknowledgment of having made a prior statement precludes the use of extrinsic *378 evidence to prove the inconsistent statement." See also Charles W. Gamble and Robert J. Goodwin, McElroy's Alabama Evidence § 157.03(2) (6th ed. 2009) ("Courts disallow proof of a self-contradiction by extrinsic evidence, such as writings or the testimony of others, if the witness unequivocally admits having made the self-contradictory statement. This has been recorded as the majority position nationally." (footnote omitted)). Because Osborne admitted having made the prior statements, Frazier was precluded from providing extrinsic proof of those statements. Therefore, the trial court properly excluded the transcript of Osborne's prior trial testimony.
With respect to Simmons, as noted above, Simmons admitted having made three of the prior statements about which he was questioned, but he either denied or did not recall having made the remainder of the prior statements about which he was questioned. Although extrinsic proof of a prior inconsistent statement is not admissible if the witness admits having made the statement, if the witness denies having made the statement or does not recall making the statement, extrinsic proof of the prior inconsistent statement is generally admissible. See, e.g., McElroy's Alabama Evidence, supra, § 157.03(1) ("If a proper predicate has been laid, proof may be made by others that the witness made the supposed self-contradictory statement whether the witness denies having made it or merely states that he does not remember whether or not he made it."). See also Boyd v. State, 590 So.2d 344, 349-50 (Ala. Crim. App. 1989) ("Impeachment of a witness by use of a prior inconsistent statement can be accomplished by either the testimony of the witness to whom the statement was made or by admitting the prior inconsistent statement itself, if it is a writing.").
However, "[i]f a witness makes a statement on the trial of the case, and has made a contradictory statement on another trial, and proper predicate laid, such testimony on the former trial as tends to contradict the witness may be introduced, but not the entire transcript of all the proceedings of the previous trial, and the court is under no duty to pick out the parts which are relevant and which are not." Gaither v. State, 21 Ala.App. 165, 167, 106 So. 348, 349 (1925). Although Frazier did not offer the entire transcript of the prior trial, he did offer the entirety of Simmons's prior testimony, the majority of which was consistent with his testimony at Frazier's trial. Prior consistent statements are considered inadmissible hearsay unless offered to rebut a charge of recent fabrication or improper influence or motive. See Rule 801(d)(1)(B), Ala. R. Evid.
As explained in McElroy's Alabama Evidence, supra, § 159.01:
"If a document made, signed, or otherwise approved by a witness is offered for the purpose of impeaching the witness by reason of the presence therein of a statement by the witness that is contradictory of the witness' testimony, and it happens that such document contains another statement by the witness which is not contradictory of the witness' testimony and capable of separation from the contradictory statement, the whole of the document should not ordinarily be admitted.[8] This rule that the contradictory portion, rather than the whole of the document, should be admitted *379 is subject, of course, to the further limitation that admittance of the whole or contradictory portion rests within the sound discretion of the trial court."
(Footnotes omitted.) Although Simmons did not make, sign, or otherwise approve of the transcript of his prior testimony, the transcript was certified by the court reporter, and we believe the general principle espoused above is applicable here. The inconsistent statements of Simmons in his prior testimony were easily capable of separation from the remainder of his testimony at the prior trial. Therefore, we find no abuse of discretion on the part of trial court in excluding the transcript of the entirety of Simmons's prior trial testimony, the majority of which was consistent with his testimony at Frazier's trial.
III.
Frazier also contends that the trial court erred in allowing Det. Naquin to testify about video evidence that was collected during the investigation. Specifically, Frazier argues that Det. Naquin was improperly permitted to testify regarding the substance of the video and the number stamps on the video based on information he had received from Sergeant Lance Gambrell, who did not testify at trial. Frazier argues that Det. Naquin's testimony in this regard violated his right to confrontation. Frazier also argues "that Det. Naquin's representation that [Sgt.] Gambrell was an expert in video analysis was improper and the court should have given a curative instruction to the jury." (Frazier's brief, p. 27.)
During cross-examination of Det. Naquin, the State's last witness, Frazier asked if Det. Naquin had obtained any video evidence from the various businesses near where Sankey had crashed his vehicle. Det. Naquin stated that he had not but that he had obtained video evidence from a house near the scene of the shooting. Frazier then questioned Det. Naquin extensively about the video evidence he had obtained. Det. Naquin testified that Frazier did not appear on the video but that the video did show "multiple individuals." (R. 338.) Although Frazier characterized those individuals as "running," Det. Naquin stated that he did not see anyone on the video running. (R. 338.) Det. Naquin testified that police were able to identify one of the individuals, but not the others. Det. Naquin also testified that neither Simmons nor Osborne were captured on the video.
Det. Naquin testified that the video did show Sankey entering and exiting the neighborhood where he was shot. When asked if the video showed "that a minute and 24 seconds expired from the time that he entered till the time he was seen leaving," Det. Naquin stated that that was not correct and that Sankey was in the neighborhood where the shooting occurred for more than five minutes. (R. 338.) Frazier then impeached Det. Naquin with a supplemental offense report Det. Naquin had prepared. In the report, Det. Naquin stated that he had reviewed one of the videos and that "[t]he victim's vehicle comes back northbound on Kippax Street at 1402.06 Hours and then leaves again going south on Kippax Street at 1403.30 Hours." (C. 758.) Det. Naquin then stated in the report: "The victim's car, as viewed on camera seven, showed that he arrived at the cul-de-sac at 1402.06 Hours and left after being shot at 1403.30 Hours." (C. 758.) Det. Naquin admitted having made the statements in his report, and he agreed with Frazier that police use military time and that, in military time, 1402.06 hours would mean 2:02 p.m. and 6 seconds, and 1403.30 hours would mean 2:03 p.m. and 30 seconds. However, Det. Naquin testified that the 1402 and 1403 numbers on the video did not represent the time even though he had suggested such in his report.
*380 Det. Naquin testified, and pointed to another portion of his report as support, that over five minutes elapsed between the time Sankey entered the neighborhood and left the neighborhood. Frazier moved to introduce into evidence Det. Naquin's report, and the State did not object, but the trial court did not issue a ruling at that time.
On redirect examination, the State rehabilitated Det. Naquin. First, without objection by the defense, the State introduced into evidence two photographs of Sankey's vehicle taken from the video, which depicted the 1402 and 1403 numbers referenced in Det. Naquin's report. The State then asked Det. Naquin if the numbers on the video were references to the time of day, and Det. Naquin stated that he did not think so. When the State asked the meaning of the numbers and Det. Naquin stated that he was "not a video expert," Frazier interrupted and objected to the question on the ground that "[i]t calls for speculation." (R. 347.) The trial court overruled the objection. Det. Naquin then testified that he believed that the numbers on the video were "a time marker on the video because the video has been determined to be time-lapsed, meaning motion activated. And Sergeant Gambrell determined that five minutes of the video was missing during the time the shooting happened." (R. 348.) Det. Naquin also testified that, although there was a camera facing the scene of the shooting, there was no video of the shooting because the camera was motion-activated and the shooting was too far away from the camera to have activated it.
On recross-examination by Frazier, Det. Naquin testified that he, too, initially thought that the numbers on the video represented time, which is why he referred to the numbers as hours in his supplemental report. However, Det. Naquin said that he then spoke with Sgt. Gambrell, who explained that the video was not recording continuously because it was motion-activated and that, in fact, over five minutes elapsed from the time Sankey entered the neighborhood and the time Sankey left after being shot. When asked by Frazier how he knew that five minutes had elapsed, Det. Naquin testified: "Sergeant Gambrell told me that. He's a video expert." (R. 353.) On redirect examination, the State asked Det. Naquin about Sgt. Gambrell, and Det. Naquin testified that Sgt. Gambrell "was trained to do videos on a computer and reduce it to actual frame by frame and copy them." (R. 354.)
After Det. Naquin's testimony, a lunch recess was taken. As noted in Part II of this opinion, following the recess, Frazier informed the trial court that he intended to offer into evidence a transcript of Simmons's and Osborne's testimony from a prior trial, and there was a lengthy discussion about the issue. After that discussion, the trial court stated that it was refusing to admit Det. Naquin's report as offered by Frazier. Frazier indicated that he agreed with that ruling and the following then occurred:
"[Frazier's counsel]: Judge, do we need to offer a limiting instruction to the jury, because we went ad nauseam, a lot of testimony of what's in that document outside of what I talked to Detective Naquin about, getting into Gambrell's testimony and all this. I think we might need to give a limiting instruction for the jury to ignore that portion of Naquin's testimony.
"[Prosecutor]: Judge, I think it would be totally improper to give a limiting instruction on questions that he gets to continue to hammer and ask-
"THE COURT: I'm going to let it sit like it is.
*381 "[Frazier's counsel]: I'll make a proffer for the record, if I may.
"....
"[Frazier's counsel]: ... My proffer would be about this. At the point that we offered the exhibit, you said that you were going to look at it and you would get us a ruling back.
"THE COURT: On?
"[Frazier's counsel]: What Exhibit-what was proposed Exhibit Number 2, Defendant's Exhibit Number 2, which was the investigative supplement by Detective Naquin. And, at this point, you said that's not coming in. You believe it is improper. We don't have an objection to your ruling. That's what you say.
"However, the jury heard quite a bit of testimony from Naquin that would have been considered hearsay outside of that document having already come in, okay. Such as Gambrell-I believe it was Gambrell-am I saying that right? Gambrell is supposed to be the video expert.
"....
"So, Your Honor, at this point, since that document didn't come in, that should mean that that evidence shouldn't come in either. And I would just ask you to give a limiting instruction to cure that with the jury, that they-
"THE COURT: What was the question you were asking Naquin about that you sought to admit that document, Number 2?
"[Frazier's counsel]: Well, because he had said-in his testimony previous, he had said that Mr. Sankey was the-the vehicle was seen coming into the neighborhood and leaving the neighborhood, and there was about a five-minute lag in between.
"His report clearly reflected that at 1402.06 hours, Mr. Sankey's car was seen coming into the neighborhood and that at 1403.3 hours it was seen going back out.
"....
"[Frazier's counsel]: That's a time lapse of one minute and 24 seconds. And then he explained that away with the State's assistance by saying that Gambrell had looked at it and had determined there was a five-minute lag. And he offers that this 1402, instead of being a time stamp, is a stamp of how many minutes of video recording there has been.[9]
"Well, that obviously can't be the case. The date and the date stamp are correct on there, and that wouldn't be the situation if it just came on and just came back off.
"So, Your Honor, at this point, since that exhibit is not coming in, I would ask for a limiting instruction to the jury that they should ignore the portion of Naquin's testimony that dealt with Officer Gambrell's testimony, because that's basically what happened.
"[Prosecutor]: Judge, can I respond to that?
"THE COURT: Sure.
"[Prosecutor]: I think that is the height of being disingenuous for him to take a break to get the sup out to question Detective Naquin.[10] And [defense counsel] characterizes that as Naquin, with the State's help, explained it away.
*382 "The fact of the matter is, he took a break, got the statement out. And if-the record will recall that he asked for a break to find this particular sup. He grilled Naquin ad nauseam about it, didn't get the answer he likes, and now he wants the answer stricken from the record.
"[Frazier's counsel]: That's not exactly-
"[Prosecutor]: That's exactly what happened.
"[Frazier's counsel]: Well, you know-
"THE COURT: Well, I'm not going to give any instruction or comment to the jury about the testimony of any witness. I'm not going to do it."
(R. 361-65.)
The situation here is a prime example of invited error. The record reflects that the first mention during the trial of any video evidence was during Frazier's cross-examination of Det. Naquin. The State had not presented any evidence or testimony regarding any video when Frazier began cross-examining Det. Naquin. It was Frazier who first elicited testimony from Det. Naquin regarding the substance of the video. It was Frazier who first elicited testimony from Det. Naquin about the number stamps on the video. It was Frazier who elicited testimony from Det. Naquin that Sgt. Gambrell was a video expert. And, when Det. Naquin testified that the video indicated that Sankey had been in the neighborhood where he was shot for more than five minutes, it was Frazier who used Det. Naquin's supplemental offense report to impeach Det. Naquin and offered that report into evidence. Simply put, the bulk of the testimony about which Frazier complains on appeal was elicited by him. Thus, any error in the admission of this testimony was invited by Frazier.
" 'Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.' " Jackson v. State, 620 So.2d 147, 148 (Ala. Crim. App. 1993) (quoting Phillips v. State, 527 So.2d 154, 156 (Ala. 1988) ). "[T]he appellant cannot allege as error proceedings in the trial court that were invited by [him] or that were a natural consequence of [his] own action." Inmin v. State, 668 So.2d 152, 155 (Ala. Crim. App. 1995). "The law is well settled that a party may not induce an error by the trial court and then attempt to win a reversal based on that error." Mobile Infirmary Med. Ctr. v. Hodgen, 884 So.2d 801, 808 (Ala. 2003). " 'It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice.' " Murrell v. State, 377 So.2d 1102, 1105 (Ala. Crim. App. 1979) (quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965) ).
Moreover, as this Court explained in Shaw v. State, 207 So.3d 79 (Ala. Crim. App. 2014) :
" '[E]vidence which is otherwise inadmissible is admissible to explain or rebut evidence introduced by defendant. This is true even if a defendant admits evidence during cross-examination of a State's witness, prompting the State to introduce otherwise inadmissible evidence in rebuttal. Therefore, where a defendant examines a witness so as to raise an inference favorable to defendant, which is contrary to the facts, defendant opens the door to the introduction of the State's rebuttal or explanatory evidence about the matter.'
" State v. O'Hanlan, 153 N.C.App. 546, 561, 570 S.E.2d 751, 761 (2002). 'Where one party has opened the door on an issue, the opposing party may introduce evidence to negate any false impressions *383 created.' United States v. Goodman, 243 Fed.Appx. 137, 140 (6th Cir. 2007) (not selected for publication in the Federal Reporter). 'It is fundamental that where the defendant "opened the door" and "invited error" there can be no reversible error.' United States v. Beason, 220 F.3d 964, 968 (8th Cir. 2000)."
207 So.3d at 118-19. Additionally:
"When one party impeaches a witness by proof of an inconsistent statement made in a conversation or writing then the opposing party may bring out so much of the remainder of the conversation or writing as goes to explain away the apparent impeaching effect of the prior statement. This admissibility is an application of the much broader completeness doctrine.
"Customarily, the remainder of the conversation or writing is admissible only for the nonsubstantive purpose of rehabilitating the witness. However, if the inconsistent statement is offered for both impeachment and as truth of the matter asserted then the remainder would be admissible both to rehabilitate and substantively to rebut or offset the statement."
McElroy's Alabama Evidence, supra, § 159.03(2).
Once Frazier cross-examined Det. Naquin about the video and impeached Det. Naquin with his supplemental offense report in order to suggest to the jury that the number stamps on the video reflected the time and that Sankey had been in the neighborhood where he was shot for only a minute and a half, it was permissible for the State to rehabilitate Det. Naquin on redirect examination. The State was properly permitted to question Det. Naquin about other portions of his report, specifically those portions reflecting information he had received from Sgt. Gambrell indicating that Sankey had been in the neighborhood for over five minutes, not a minute and a half as Frazier had suggested to the jury, in order to rehabilitate Det. Naquin and to negate the impression that Sankey had not been in the neighborhood long enough to have been shot.
Moreover, because it was Frazier that elicited the majority of the testimony from Det. Naquin about which he now complains, and because any additional testimony from Det. Naquin brought out by the State was permissible as rehabilitation, there was no basis for striking any of Det. Naquin's testimony or for providing a curative instruction to the jury.
For these reasons, we find no error on the part of the trial court in allowing Frazier to elicit testimony from Det. Naquin regarding video evidence that was collected during the investigation into Sankey's shooting, in allowing the State to rehabilitate Det. Naquin with hearsay statements from Sgt. Gambrell after Frazier impeached Det. Naquin, in refusing to strike Det. Naquin's testimony, and in refusing to give a curative instruction to the jury.
IV.
Finally, Frazier contends that the evidence was insufficient to sustain his convictions. Specifically, Frazier argues that Simmons's and Osborne's testimony was inconsistent with testimony they gave in a previous trial, that the physical evidence indicated that Sankey was not hit with a pistol as Simmons and Osborne testified, that Frazier's expert's testimony indicated that Sankey was not in his vehicle when he was shot as Simmons and Osborne testified, and that the only evidence of a robbery was "the inconsistent statements of Osborne and Simmons." (Frazier's brief, p. 31.)
Although Frazier purports in his brief to this Court to be challenging *384 the sufficiency of the evidence, his argument is based solely on the conflicting evidence presented at trial and the credibility of the State's witnesses and, thus, is a challenge to the weight of the evidence, not its sufficiency.
"The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, 'viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.' Tibbs v. Florida, 457 U.S. 31, 37, 102 S.Ct. 2211, 2216, 72 L.Ed.2d 652 (1982). Accord, Prantl v. State, 462 So.2d 781, 784 (Ala. Cr. App. 1984)....
"In contrast, '[t]he "weight of the evidence" refers to "a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other." ' Tibbs v. Florida, 457 U.S. at 37-38, 102 S.Ct. at 2216 (emphasis added)."
Johnson v. State, 555 So.2d 818, 819-20 (Ala. Crim. App. 1989), on return to remand, 576 So.2d 1279 (Ala. Crim. App. 1990), rev'd on other grounds, 576 So.2d 1281 (Ala. 1991). "The issue of the weight of the evidence is preserved by a motion for a new trial, stating 'that the verdict is contrary to law or the weight of the evidence.' " Zumbado v. State, 615 So.2d 1223, 1241 (Ala. Crim. App. 1993). Although Frazier filed a motion for a new trial, he did not challenge the weight of the evidence in that motion. Therefore, this issue is not properly before this Court for review. See, e.g., Douglas v. State, 900 So.2d 1271, 1272 (Ala. Crim. App. 2004) ; and Underwood v. State, 834 So.2d 819, 822 (Ala. Crim. App. 2001).
In any event, Frazier's argument is meritless. Any "inconsistencies and contradictions in the State's evidence, as well as [any] conflict between the State's evidence and that offered by the appellant, [go] to the weight of the evidence and [create a question] of fact to be resolved by the jury." Rowell v. State, 647 So.2d 67, 69-70 (Ala. Crim. App. 1994). " ' "[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine." ' " Johnson, 555 So.2d at 820 (quoting Harris v. State, 513 So.2d 79, 81 (Ala. Crim. App. 1987), quoting in turn Byrd v. State, 24 Ala. App. 451, 451, 136 So. 431, 431 (1931) ). "We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial." Johnson, 555 So.2d at 820. " 'When the jury has passed on the credibility of evidence tending to establish the defendant's guilt, this Court cannot disturb its finding.' " Rowell, 647 So.2d at 69 (quoting Collins v. State, 412 So.2d 845, 846 (Ala. Crim. App. 1982) ). Furthermore, " '[t]his Court must view the evidence in the light most favorable to the State, and "draw all reasonable inferences and resolve all credibility choices in favor of the trier of fact." ' " D.L. v. State, 625 So.2d 1201, 1204 (Ala. Crim. App. 1993) (quoting Woodberry v. State, 497 So.2d 587, 590 (Ala. Crim. App. 1986) ). "Any issues regarding the weight and credibility of the evidence are not reviewable on appeal once the state has made a prima facie case." Jones v. State, 719 So.2d 249, 255 (Ala. Crim. App. 1996), aff'd, 719 So.2d 256 (Ala. 1998).
Viewed in the light most favorable to the State, the evidence adduced at trial, as set out at the beginning of this opinion, was more than sufficient to establish a prima facie case of both counts of capital murder as charged in Frazier's indictment. Any conflicts in the evidence and the credibility of the witnesses were for the jury to determine. The jury obviously resolved those issues adversely to Frazier, and we will not disturb those findings on appeal.
*385 V.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
Windom, P.J., and Welch, Burke, and Joiner, JJ., concur.

Before trial, the trial court determined that Frazier was intellectually disabled and, therefore, not eligible for the death penalty. See Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

Davis was also charged for his participation in the crime; he was acquitted after a jury trial.

Although Frazier's counsel indicated to the trial court that Brandy had informed him that she had not given any letter to Det. Naquin, Brandy was not called to testify at trial.

Simmons specifically denied that he had testified in the prior trial that he had never been in Osborne's vehicle the day of the shooting. When confronted with the transcript of his prior testimony, Simmons stated that the transcript indicating a negative response to two questions regarding whether he had been in Osborne's vehicle was incorrect. The transcript of Simmons's prior testimony, which is included in the record on appeal, indicates that when Simmons was asked if he was in Osborne's vehicle at any point the day of the shooting, Simmons responded affirmatively, stating "Uh-huh," but the court reporter then typed in parentheses "negative response." (C. 807.) When the question was repeated, Simmons again responded affirmatively, stating "Uh-huh," but again the court reporter typed in parentheses "negative response." (C. 807.) On redirect examination, the prosecutor cleared up the confusion. Simmons testified on redirect that he did not say "negative response," as the court reporter had typed and that the court reporter apparently misunderstood his response.

The bulk of Frazier's cross-examination of Osborne was about Osborne's statement to police, not Osborne's testimony at the prior trial.

Although Frazier offered the transcript after he had rested his case, a trial court has discretion to allow a party to reopen its case. See Rule 19.1(h), Ala. R. Crim. P. The State did not object to the admission of the transcript on the ground that Frazier had already rested his case and the trial court's ruling was not based on the timing of Frazier's offer.

Frazier also relies on Rule 16.6(e), Ala. R. Crim. P. However, in Baker v. State, 87 So.3d 587, 601 (Ala. Crim. App. 2009), this Court recognized that Rule 16.6(e) applies only to depositions, not to prior trial testimony.

Of course, "[i]f a contradictory statement in a document is so interwoven with a noncontradictory statement therein as to render it impracticable to show the contradictory statement without showing the noncontradictory statement, then the whole of the document is admissible." McElroy's Alabama Evidence, supra, § 159.01.

This is incorrect. When asked by the State if the numbers reflected the number of minutes or hours that were recorded, Det. Naquin stated that they did not.

The record indicates that after Det. Naquin testified on cross-examination that Sankey had been in the neighborhood over five minutes, Frazier requested a recess so that he could find Det. Naquin's supplemental offense report.